Jeff EMERY, Petitioner,

v.

Gary JOHNSON, Respondent.

Civil Action No. H–95–3939.

United States District Court,
S.D. Texas,
Houston Division.

Aug. 30, 1996.

---

Thomas D. Moran, Schneider & McKinney, Houston, TX, for petitioner.

Meredith Anne Martinez, Office of the Attorney General, Austin, TX, for respondents.

## ORDER

GILMORE, District Judge.

Pending before the Court are cross-motions for summary judgment (Instrument Nos. 17 and 21). Having considered the submissions of both parties, the record of the proceedings below, and the relevant law, the Court concludes that the respondent is entitled to summary judgment on all claims.

### I.

#### A. Procedural Posture

The petitioner, Jeff Emery, is incarcerated pursuant to the judgment and sentence of the 272nd District Court in Brazos County, Texas, in cause number 14,695 styled *The State of Texas v. Jeff Emery*. Emery was originally convicted for the capital murder of LaShan Muhlinghaus on May 23, 1986. On November 14, 1990, the Court of Criminal Appeals reversed the conviction due to the fact that part of the record of pre-trial proceedings was lost. *Emery v. State*, 800 S.W.2d 530, 536 (Tex.Crim.App.1990). The State charged Emery by indictment with the capital offense of the intentional murder of Muhlinghaus committed in the course of committing and attempting to commit burglary. Emery pleaded not guilty before the jury and, on November 22, 1991, the jury found him guilty as charged in the indictment. On November 26, 1991, after a separate punishment hearing, the jury answered affirmatively the special punishment issues submitted pursuant to the former provisions of Article 37.071 of the Texas Code of Criminal Procedure. *See* Tex.Code Crim.Proc.Ann. art. 37.071(b)(1) and (2) (West 1981, since amended). The trial court sentenced Emery to death by lethal injection.

The Texas Court of Criminal Appeals affirmed Emery's conviction and sentence in a published opinion on May 11, 1994, and denied rehearing on May 11, 1994. *Emery v. State*, 881 S.W.2d 702 (Tex.Crim.App.1994). On February 27, 1995, the United States Supreme Court denied his petition for writ of certiorari. *Emery v. Texas*, —— U.S. ——, 115 S.Ct. 1257, 131 L.Ed.2d 137 (1995). On

March 24, 1995, the trial court set an execution date of August 4, 1995.

Through court-appointed counsel, Emery filed an application for state writ of habeas corpus pursuant to article 11.07 of the Texas Code of Criminal Procedure on July 5, 1995. On July 25, 1995, the state habeas trial court conducted an evidentiary hearing and, on July 28, 1995, filed findings of fact and conclusions of law recommending that relief be denied. On August 1, 1995, the Texas Court of Criminal Appeals denied relief on the basis that the record supported the trial court's findings and conclusions. *Ex parte Emery*, Application No. 29,220–01.

On August 1, 1995, Emery filed in this Court a *pro se* motion for appointment of new counsel under 21 U.S.C. § 848(q) and a motion for a stay of execution. This Court stayed Emery's execution on August 3, 1995, and appointed new counsel. Subsequently, Emery filed a second state habeas application in the state trial court on November 10, 1995, before filing his current petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 on November 20, 1995. On February 21, 1996, the Texas Court of Criminal Appeals dismissed Emery's state habeas application based on the pendency of the proceeding in this Court. *Ex parte Emery*, No. 29,220–02. Both parties have filed motions for summary judgment on all claims.

### B. Statement of Facts

The Texas Court of Criminal Appeals set forth the facts as follows:

> The evidence showed that on the night of October 12, 1979, the deceased felt ill at work and returned early to the apartment she shared with a roommate. Once home, she undressed and went into her roommate's room to return a dress she had borrowed. [Emery] was hiding in the roommate's closet, having previously unlawfully entered the empty apartment with a pass key. [Emery] attacked the deceased from behind, stabbing her four times in the back. The deceased turned and [Emery] knocked her to the floor and continued stabbing her until she was dead. [Emery] then had sexual intercourse with the deceased's body. [Emery] wiped clean any fingerprints he might have left in the apartment and on the front door before fleeing the scene.
>
> At home [Emery] showered and disposed of his blood-stained clothes and knife. Curiously, [Emery] then forced his wife, Deborah Emery, to accompany him back to the scene of the crime to watch the police investigation. [Emery] confessed to his wife that night that he had committed the murder and subsequently confessed to two other people.
>
> The police investigation revealed no sign of a forced entry or of anything missing from the apartment. The deceased was stabbed twenty-five times, resulting in her death.

*Emery*, 881 S.W.2d at 704.

Emery raises a number of claims as grounds for federal habeas relief. The claims presented in Emery's Petition for a Writ of Habeas Corpus may be distilled as follows: (1) trial counsel rendered ineffective assistance of counsel by (a) opening the door to otherwise inadmissible confidential marital communications, (b) opening the door to extraneous offenses and by failing to request a limiting instruction in this regard, and (c) failing to object to the definition of "intentional" in the jury charge; (2) the prosecutor engaged in misconduct by allegedly requesting jail authorities to manipulate Emery's conditions of confinement to cause him to appear aggressive at trial in violation of Emery's fifth, sixth, and fourteenth amendment rights; (3) the State used Fred Zain to conduct DNA testing, thus violating Emery's sixth amendment right to counsel and fourteenth amendment right to due process; (4) the imposition of the death penalty violates Emery's eighth and fourteenth amendment rights because each local prosecuting attorney has the unreviewable discretion to seek the death penalty or a life sentence in connection with a capital murder conviction; (5) the imposition of the death penalty violated the eighth amendment because Texas law irrationally excludes those with two or more felony convictions from eligibility for the death penalty; (6) Emery was denied the right to testify in his own behalf by his attorney's coercion in violation of the fifth,

sixth, and fourteenth amendments; and (7) Emery's death sentence violates the eighth amendment because the jury charge did not include a vehicle by which the jury could give mitigating effect to evidence that Emery was abused as a child.

## II.

A petitioner may obtain federal habeas relief "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Thus, to the degree that Emery's claims are grounded on violations of state law, they are not cognizable on federal habeas corpus review. *See Estelle v. McGuire*, 502 U.S. 62, 67, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991) ("We have stated many time that 'federal habeas corpus relief does not lie for errors of state law.'"). Further, trial error, even of constitutional magnitude, provides a basis for reversal only if it "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993), *quoting Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946); *see also O'Neal v. McAninch*, — U.S. ——, ——, 115 S.Ct. 992, 999, 130 L.Ed.2d 947 (1995).

■ In consideration of summary judgment motions in ordinary civil cases, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1985). This case, however, is not an ordinary civil action but a federal habeas action challenging a state court judgment. The Federal Rules of Civil Procedure are thus applicable only to the extent that they do not conflict with the habeas rules and to the extent appropriate. Rule 11, 28 U.S.C. foll. § 2254. Further, when, as here, a state prisoner's factual allegations have been resolved by express or implicit fact findings of the state courts, and he does not demonstrate applicability of a statutory exception to the presumption of correctness set forth in 28 U.S.C. § 2254(d), it is inappropriate, if not unauthorized, for such facts and inferences to be drawn in his favor. *Marshall v. Lonberger*, 459 U.S. 422, 432, 103 S.Ct. 843, 849–50, 74 L.Ed.2d 646 (1983); *Sumner v. Mata*, 449 U.S. 539, 547–48, 101 S.Ct. 764, 769–70, 66 L.Ed.2d 722 (1981). Finally, where there has been a hearing in state court, a habeas petitioner is not entitled to additional factual development of his grounds for relief in federal habeas review. *See Keeney v. Tamayo–Reyes*, 504 U.S. 1, 9–10, 112 S.Ct. 1715, 1720, 118 L.Ed.2d 318 (1992).

■ Under Section 2254(d), findings of fact made by a state court after a hearing on the merits of a habeas action are entitled to a presumption of correctness on federal habeas corpus review. *Marshall*, 459 U.S. at 432, 103 S.Ct. at 849. The presumption applies to fact findings of state appellate courts that are based on a review of the record, as well as to state trial court findings. *Sumner*, 449 U.S. at 546–47, 101 S.Ct. at 769. When, as here, the same judge who presided at trial conducts the petitioner's state habeas proceedings and makes findings based on the record, such a procedure is sufficient to afford the petitioner a full and fair hearing. *Amos v. Scott*, 61 F.3d 333, 347 (5th Cir.), *cert. denied*, — U.S. ——, 116 S.Ct. 557, 133 L.Ed.2d 458 (1995); *Armstead v. Scott*, 37 F.3d 202, 207–08 (5th Cir.1994), *cert. denied*, — U.S. ——, 115 S.Ct. 1709, 131 L.Ed.2d 570 (1994).

■ Federal courts should accord state court fact findings a high measure of deference. *Marshall*, 459 U.S. at 432, 103 S.Ct. at 850. "This deference requires that a federal habeas court more than simply disagree with the state court before rejecting its factual determinations. Instead, it must conclude that the state court's findings lacked even 'fair[ ] support' in the record." *Id.*; 28 U.S.C. § 2254(d)(8). Thus, the presumption applies even if the findings are based on an ambiguous state court record. *Teague v. Scott*, 60 F.3d 1167, 1170 (5th Cir.1995). Finally, the habeas petitioner bears the burden of proving by convincing evidence that the factual determinations of the state courts are erroneous. *LaVallee v. Delle Rose*, 410 U.S. 690, 695, 93 S.Ct. 1203, 1206, 35 L.Ed.2d 637 (1973); *Schwander v. Blackburn*, 750 F.2d 494, 498 (5th Cir.1985).

The Court notes that on April 24, 1996, President Clinton signed the Anti–Terrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214 (1996). The Act includes amendments to 28 U.S.C. § 2254 governing the appropriate standard of review as to claims that were adjudicated on the merits in state court. Anti–Terrorism Act, § 104, 110 Stat. at 1218–20. For purposes of this action, the Court needs not decide whether the new amendments are applicable because the outcome under both versions of section 2254 is the same.

■ The State asserts that Emery has procedurally defaulted several claims by failing to raise them on direct appeal or in his first state habeas proceeding. A petitioner must fulfill the exhaustion requirement of 28 U.S.C. § 2254(b) by presenting them to the highest state court. *Dupuy v. Butler*, 837 F.2d 699, 702 (5th Cir.1988); *Ridgway v. Baker*, 720 F.2d 1409, 1412–13 (5th Cir.1983). 28 U.S.C. § 2254(b) states that a habeas petitioner may not obtain relief "unless it appears that the applicant has exhausted the remedies available in the courts of the state or that there is either an absence of available state corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner." To satisfy the exhaustion requirement of 28 U.S.C. § 2254(b), a Texas state prisoner must present his claims to the Texas Court of Criminal Appeals for review. *Richardson v. Procunier*, 762 F.2d 429, 431 (5th Cir. 1985); *Ridgway*, 720 F.2d at 1413. The petitioner must have informed the state court of the same facts and legal theory upon which he bases his assertions in his federal habeas petition. *Picard v. Connor*, 404 U.S. 270, 276–77, 92 S.Ct. 509, 512–13, 30 L.Ed.2d 438 (1971); *see also Brown v. Estelle*, 701 F.2d 494, 495 (5th Cir.1983).

If no effective state court remedy exists for the petitioner's claims, then the exhaustion requirement is technically fulfilled. *Teague v. Lane*, 489 U.S. 288, 298, 109 S.Ct. 1060, 1068–69, 103 L.Ed.2d 334 (1989). Failure to properly assert the allegations in state court may constitute procedural default of federal habeas review of the claims. *See Coleman v. Thompson*, 501 U.S. 722, 735 n.

1, 111 S.Ct. 2546, 2557 n. 1, 115 L.Ed.2d 640 (1991); *Teague*, 489 U.S. at 298, 109 S.Ct. at 1068–69. A petitioner who has procedurally defaulted a claim in state court is barred from raising it in a federal habeas corpus proceeding unless he can demonstrate cause for the default, and prejudice attributable to the default. *Teague*, 489 U.S. at 298, 109 S.Ct. at 1068; *Engle*, 456 U.S. at 129, 102 S.Ct. at 1572–73. The prisoner may avoid the cause and prejudice requirement only by a showing of actual innocence. *Murray v. Carrier*, 477 U.S. 478, 496, 106 S.Ct. 2639, 2649, 91 L.Ed.2d 397 (1986).

The following claims were not raised on direct appeal or in Emery's first state habeas proceeding: (1) trial counsel rendered ineffective assistance of counsel in failing to object to the definition of "intentional" included in the court's charge; (2) prosecutorial misconduct regarding the conditions of Emery's confinement violated his fifth, sixth, and fourteenth amendment rights; (3) the State used Fred Zain to conduct DNA testing in violation of Emery's sixth amendment right to counsel and fourteenth amendment right to due process; (4) Emery's death sentence violates his eighth and fourteenth amendment rights because each local prosecuting attorney has the unreviewable discretion to seek the death penalty or a life sentence in a capital murder prosecution; (5) the imposition of the death penalty violates Emery's eighth amendment rights because Texas law irrationally exempts those with two or more prior felony convictions from eligibility to receive the death penalty; and (6) Emery was deprived of his sixth amendment right to counsel and effective assistance of counsel by his trial attorney's threat the walk out of the courtroom if Emery testified.

Emery attempted to exhaust the above claims by raising them in a second state habeas application, but the Court of Criminal Appeals dismissed the proceeding due to the pendency of the instant federal habeas action. *Ex parte Emery*, Application No. 29,-220–02. The Court of Criminal Appeals applied the state doctrine of habeas abstention: "A petitioner must decide which forum he will proceed in, because this Court will not, and a trial court in this State should not,

consider a petitioner's application so long as the federal courts retain jurisdiction over the same matter." *Ex parte Emery,* no. 29,220–02 (citing *Ex parte Green,* 548 S.W.2d 914 (Tex.Crim.App.1977); *Ex parte Powers,* 487 S.W.2d 101 (Tex.Crim.App.1972)).

■ Emery argues that his claims are not barred because the Texas Court of Criminal Appeals did not deny relief based on procedural default. Although under *Harris v. Reed,* 489 U.S. 255, 265, 109 S.Ct. 1038, 1044, 103 L.Ed.2d 308 (1989), federal review of a habeas claim is procedurally barred only if the last state court to consider the claim expressly and unambiguously based its denial of relief on a state procedural default, "[t]his rule does not apply if the petitioner failed to exhaust state remedies and the court to which petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred. *In such a case there is a procedural default for purposes of federal habeas regardless of the decision of the last state court to which the petitioner actually presented his claims." Coleman,* 501 U.S. at 735 n. 1, 111 S.Ct. at 2557 n. 1 (emphasis added) (citations omitted). The decision of the Texas Court of Criminal Appeals to dismiss the petition on abstention grounds does not prevent this Court from holding that the claims first presented to the state court in the second state habeas petition are barred from federal habeas review because the Texas Court of Criminal Appeals would find the claims procedurally barred.

The claims first presented in Emery's second state habeas petition are barred from consideration on the merits by a Texas statute which provides that a court may not consider the merits of or grant relief on claims presented in a successive state habeas application unless the applicant shows cause or satisfies an actual innocence exception. Tex.Code Crim.Proc.Ann. art. 11.071 § 5(a) (West Supp.1996) ("article 11.071"). Because section five of article 11.071 prevents the Court of Criminal Appeals from addressing the merits of Emery's successive state habeas application, Emery is procedurally barred from asserting the claims on federal habeas

review. *Coleman,* 501 U.S. at 735 n. 1, 111 S.Ct. at 2557 n. 1.

Emery responds that section five of article 11.071 does not apply to him, mainly because the Court of Criminal Appeals dismissed the second habeas petition based on abstention policy rather than abuse of the writ. This argument is incorrect. Section 5(c) states that the court of criminal appeals shall dismiss an application as an abuse of the writ under this section in the event that the clerk of the convicting court receives a successive petition. Neither the statute nor case law suggests that the decision of the court of criminal appeals to abstain from hearing the claims presented in the second state habeas petition constitutes a decision that article 11.071 does not apply to the second state habeas petition.

■ Moreover, Emery argues, the statute took effect on September 1, 1995, after he had filed his first state habeas application. Emery asserts that the statute does not apply to him for this reason. As of September 1, 1995, if a subsequent habeas petition is filed after filing an original application, a court may not consider the merits of or grant relief based on the subsequent or untimely original application unless the application falls within exceptions not relevant to this case. Tex.Code Crim.Ann. art. 11.071 § 5(a). Under section 5(a) of article 11.071, the petitioner is barred from asserting claims in his second habeas petition that were not included in his first state habeas petition for a hearing on the merits. Because the court of criminal appeals would find the claims procedurally barred from consideration on the merits, Emery has procedurally defaulted on those claims. *Coleman,* 501 U.S. at 735 n. 1, 111 S.Ct. at 2557 n. 1.

Emery argues that the question of whether the claims first presented to a state court in his second habeas petition are subject to article 11.071 is a question best certified to the Fifth Circuit pursuant to 28 U.S.C. § 1292(b). Section 1292(b) states, "When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for

difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, [s]he shall so state in writing such order." The Court finds nothing that would limit the application of article 11.071 regarding Emery's successive claims. This issue is significant, however, in determining whether the petitioner's claims are procedurally barred from review in a federal habeas action and the Court finds that reasonable jurists could reach contrary conclusions. Accordingly, a certificate of probable cause shall issue in this case based primarily on this question.

■ Even if this Court were to hold that article 11.071 applies to Emery's second state habeas application, Emery argues that his claims are not procedurally barred. Emery argues that he is not procedurally barred because the application of article 11.071 constitutes "cause and prejudice" and excuses his failure to present all of his claims in his first state habeas application. Cause sufficient to excuse a procedural bar must "be something external to the petitioner, something that cannot fairly be attributed to him...." *Coleman v. Thompson,* 501 U.S. 722, 753, 111 S.Ct. 2546, 2566, 115 L.Ed.2d 640 (1991). Emery argues that the external reason for lack of compliance would be the passage of article 11.071, which breaks with Texas practice and law. This argument is circular and incorrect. A statute that prohibits the filing of *successive* habeas applications cannot be construed as limiting what may or may not be required of an initial habeas application.

The Court will address only those claims that have not been procedurally barred.

Emery claims that he was denied effective assistance of counsel in three respects. Two of those issues have been properly exhausted and will be addressed here. Emery asserts that trial counsel (1) waived the marital communications privilege regarding the testimony of Deborah Emery and (2) opened the door to the admission of otherwise inadmissible extraneous offenses and failed to request a limiting instruction with regard to those offenses.

The proper standard for evaluating the effectiveness of counsel is reasonable performance under prevailing professional norms. *Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 2064-65, 80 L.Ed.2d 674 (1984). In *Strickland,* the Supreme Court established a two-prong test for resolving ineffective assistance claims. Under that test, a defendant must show that counsel's performance was deficient, and that the deficient performance prejudiced the defense. *Id.* at 687, 104 S.Ct. at 2064. "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Id.* at 700, 104 S.Ct. at 2071.

To establish deficient performance, the petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed ... by the Sixth Amendment." *Id.* at 687, 104 S.Ct. at 2064. In reviewing ineffectiveness claims "judicial scrutiny of counsel's performance must be highly deferential," and every effort must be made to eliminate "the distorting effect of hindsight." *Id.* at 689, 104 S.Ct. at 2065. Courts must indulge a strong presumption "that but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. A reasonable probability is one that is sufficient to undermine confidence in the outcome. *Id.* However, "an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective." *Lockhart v. Fretwell,* 506 U.S. 364, 369, 113 S.Ct. 838, 842, 122 L.Ed.2d 180 (1993). Thus, in addition to establishing a reasonable probability of a different result, a petitioner must demonstrate that counsel's deficient performance rendered the result of the proceeding fundamentally unfair or unreliable. *Vuong v. Scott,* 62 F.3d 673, 685 (5th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 557, 133 L.Ed.2d 458 (1995) (citing *Lockhart,* 506 U.S. at 372, 113 S.Ct. at 844).

■ Finally, the burden of proof in a habeas corpus proceeding attacking the effectiveness of trial counsel is upon the petitioner, who must demonstrate that ineffectiveness by a preponderance of the evidence.

*Jernigan v. Collins*, 980 F.2d 292, 296 (5th Cir.1992), *cert. denied*, 508 U.S. 978, 113 S.Ct. 2977, 125 L.Ed.2d 675 (1993); *Martin v. Maggio*, 711 F.2d 1273, 1279 (5th Cir. 1983), *cert. denied*, 469 U.S. 1028, 105 S.Ct. 447, 83 L.Ed.2d 373 (1984). A petitioner's conclusory and speculative allegations will not suffice in this regard. *Kinnamon v. Scott*, 40 F.3d 731, 734–35 (5th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 660, 130 L.Ed.2d 595 (1994); *Barnard v. Collins*, 958 F.2d 634, 643 n. 11 (5th Cir.1992), *cert. denied*, 506 U.S. 1057, 113 S.Ct. 990, 122 L.Ed.2d 142 (1993).

■■■ Emery faults counsel for allowing Emery's ex-wife to testify that, during their marriage, Emery had confessed to her that he had committed the murder. Under Texas law, the confidential marital privilege allows a spouse to refuse to disclose, and to prevent another from disclosing, a confidential communication made to his spouse while they were married. Tex.R.Crim.Evid. 504(1)(b). The privilege continues after the marriage ends. *Freeman v. State*, 786 S.W.2d 56 (Tex. App.—Houston [1st Dist.] 1990, no pet.). "A communication is confidential if it is made privately by any person to his spouse and it is not intended for disclosure to any other person." Tex.R.Crim.Evid. 504(1)(a). The marital communications privilege does not prevent a spouse from testifying to acts observed during the marriage, but only to utterances. *Sterling v. State*, 814 S.W.2d 261, 261–62 (Tex.App.—Austin 1991, pet. ref'd.); *Freeman v. State*, 786 S.W.2d 56, 59 (Tex. App.—Houston [1st Dist.] 1990, no pet.). A person waives the privilege if he "voluntarily discloses or consents to disclosure of any significant part of the privileged matter." Tex.R.Crim.Evid. 511(1).

Emery notes that trial counsel mistakenly believed that former article 38.11 governed Emery's trial. At the time of the offense in 1979, the marital communication privilege was governed by former article 38.11 of the Texas Code of Criminal Evidence. Texas Rule of Criminal Evidence 504 applied to trials commenced after its effective date in September 1986. *Willard v. State*, 719 S.W.2d 595, 601 (Tex.Crim.App.1986); *Freeman v. State*, 786 S.W.2d 56, 58 (Tex.App.—

Houston [1st Dist.] 1990, no pet.). The adoption of Texas Rule of Criminal Evidence Rule 504 did not effect any substantive change in the marital communications privilege. Thus, counsel's belief did not prejudice Emery.

■■■ The record reflects that the marital communication was waived by the defense. The transcript of a November 18, 1991 pretrial hearing regarding the spousal privilege reflects that the prosecutor instructed Deborah Emery to testify only as to what she saw, not the contents of any communications with Petitioner. She proceeded to testify regarding her background with Emery. She also testified that on the night of October 12, 1979, Emery came home about 6 p.m., changed into a dark pocket T-shirt, blue jeans, and work boots, then left about 7 p.m. Approximately one to one and one-half hour later, Emery returned to the apartment and kicked loudly on the door. When she opened the door, Deborah Emery saw that he had blood smeared on his arms and his hands, on his shirt, his pants and some on his work boot. Emery undressed and Deborah Emery saw that he had blood on his underpants. After showering, Emery threw his bloody clothes into a dumpster. He wiped blood off of a wood-handled, lock-blade knife that he had carried on a daily basis and threw the knife down a gutter in front of the Emery's apartment building. He then wiped off the door handle and steering wheel of the car. Emery and his wife drove to a Dairy Queen near their apartment and got a drink. Emery drove to the Travis House Apartments (the site of the murder) and she saw police cars, an ambulance, onlookers and the sheriff. Two months later, the Emerys moved to Milwaukee, Wisconsin. At their apartment in Milwaukee, Emery told Jim Smith in front of Deborah Emery that he could kill someone and get away with it, and that he had done it to a man in Texas. Emery told Smith to ask Debbie for verification. In July 1982, Deborah Emery began divorce proceedings and, in December, reported what she knew about the murder to the police in Milwaukee.

Before the State passed Deborah Emery for cross-examination, the prosecutor approached the bench and informed both the trial court and defense counsel that Deborah

Emery had been instructed to testify only as to what she saw and not to the contents of any communications with Emery. The prosecutor also stated that Deborah Emery had been instructed that if defense counsel questioned her regarding confidential statements or her responses resulting from what Emery had said to her, then counsel would be inviting her to respond with testimony about confidential communications. Defense counsel agreed that if he opened the door, then all of the incriminating statements made by Emery to his ex-wife could come in during re-direct.

On cross-examination, defense counsel impeached Deborah Emery with inconsistencies in her statements and questioned whether she had lied to police in an effort to facilitate divorce proceedings. Defense counsel proceeded to ask Deborah Emery, among other things, what Emery told her regarding what had happened that evening. Defense counsel also asked her to describe Emery's reaction upon learning that a girl had been stabbed at the Travis House Apartments. Upon the questions of trial counsel, she testified that she waited five to six months after separating from Emery to go to the police because Emery had made threats toward her family.

On re-direct, Deborah Emery read from the statement that she had given the Milwaukee police on December 6, 1982 concerning what Emery had told her about the murder. The statement details how Emery admitted that he had stabbed the person at the apartments and that the person was a girl and not a man. He told Deborah Emery that he went to the apartment in hopes of getting some jewelry that he had seen while he was servicing the apartment. At the time he serviced the apartment he was working for Mickey O'Reilly at Mickey's Appliance in Bryan, Texas. He told her that he stood outside the bedroom window and waited to see if anyone was home. He entered the bedroom through the window and stood there in the dark. A girl entered the room where he was and asked who was there. He approached her and stabbed her. She screamed and he stabbed her until she no longer moved or made any noise. He told Deborah Emery that the girl must have had long hair and that she was naked. After he killed her, Emery took a shirt of hers and wiped off all his fingerprints and left the apartment through the front door using the shirt to wipe off the doorknobs.

In affidavits submitted during Emery's state habeas proceeding, both defense counsel explained their rationale for waiving the marital communications privilege. John Quinn state that he had consciously decided to go into marital communications because he believed they would eventually come into evidence if he attacked Deborah Emery's credibility by showing that she was lying about Emery's involvement in order to get a divorce and keep him away from his son. He believed that if the State succeeded in introducing the marital communications for the first time on rebuttal, this would defeat his objective of showing the jury that Emery had nothing to hide in the way of evidence. Finally, Quinn stated that, at the time Deborah Emery testified, there was a good chance that Emery would testify, and the State would be allowed to question him about her statement. Co-counsel Margaret Polansky submitted an affidavit stating that, to the best of her recollection, the strategy with regard to marital communications was discussed with Emery and agreed to by him.

In an evidentiary hearing held July 25, 1995, Quinn testified that he believed Emery's defense of mistaken identity, which was based on a witness' identification of a man named Robert Combs at the crime scene, was strong, and he therefore tried his case for a "not guilty" verdict. Quinn stated that the success of the mistaken identity defense would require that the defense appear as though nothing were being hidden. Quinn believed that acknowledging facts that are potentially harmful is one way of achieving credibility. Moreover, Quinn believed that Emery would testify against the advice of his counsel and inadvertently open the door to the privileged communications.

The state habeas trial court entered the following findings of facts related to ineffective assistance of counsel:

. . . .

16. It was John Quinn's defense strategy to be honest and straightforward with the

jury, to avoid giving the indication that the defense was hiding anything.

17. John Quinn and Margaret Polansky discussed the advantages and disadvantages of eliciting testimony from Applicant's ex-wife, Debbie Emery, that revealed marital communications from Applicant to Debbie Emery.

18. A strategic decision was made to ask Debbie Emery about marital communications on cross-examination, though it may have been based in part on an erroneous legal analysis.

19. The defense's objective during cross-examination of Debbie Emery was to show that she had a motive to testify falsely against Applicant, in that she wanted to keep him in prison to prevent him from seeing his son.

20. The defense reasoned that, if it impeached the credibility of Debbie Emery, the State might succeed in introducing her previous statements to police that included otherwise inadmissible marital communications.

21. As of the time Debbie Emery testified, the defense thought it was possible that Applicant would later testify, making him subject to cross-examination about his confession to Debbie Emery.

22. John Quinn reasonable believed that if Applicant did testify, his prior statements to Debbie Emery would become admissible as impeachment.

23. John Quinn concluded that he would lessen the sting of the damaging marital communications from Jeff Emery to Debbie by eliciting them himself.

24. The substance of the marital communications that Debbie Emery testified to was duplicated by the testimony of James Smith and Marie Michaeloff.

25. Applicant's extrajudicial confession to Marie Michaeloff was more detailed than the marital communications testified to by Debbie Emery.

26. The decision to open up the marital communications between Applicant and Debbie Emery was not an unreasonable trial strategy.

27. In holding the evidence sufficient to support the verdict finding Applicant guilty of capital murder, the Texas Court of Criminal Appeals did not rely solely on the testimony of Debbie Emery regarding marital communications.

28. The Court does not find that the admission of the marital communications from Applicant to Debbie Emery prejudiced the defense.

*Ex parte Emery,* Application No. 29,220–01, Findings of Fact and Conclusions of Law, at 3–4. The Court of Criminal Appeals denied Emery relief on his claim based on the trial court's findings and conclusions. *Id.*

■ Although a state court's determination that defense counsel was not ineffective is a mixed question of law and fact, and thus, a federal court reviews such a conclusion *de novo*, a court's underlying fact findings made in the course of deciding an ineffective assistance claim are subject to the presumption of correctness in 28 U.S.C. § 2254(d). *Strickland,* 466 U.S. at 698, 104 S.Ct. at 2070; *Loyd v. Smith,* 899 F.2d 1416, 1425 (5th Cir.1990). Thus, the state habeas court's fact findings 16 through 25, concerning the motivation and actions of Emery's trial attorneys and the fact that the substance of Emery's confession to Deborah Emery was duplicated by more detailed testimony from another witness, must all presumed correct under 28 U.S.C. 2254(d). The federal habeas court must presume that fact findings 16 through 25 are correct in determining whether Emery was denied effective assistance of counsel.

As the State correctly argues, Emery cannot demonstrate that he was prejudiced by the admission of his confession to Deborah Emery. His ineffective assistance claim is therefore defeated. As the state court found, the testimony of James Smith and Marie Michaeloff duplicated the substance of the marital communications to which Debbie Emery testified, and further, Emery's confession to Michaeloff was more detailed than the confession to Debbie Emery. *Ex parte Emery,* Appl. No. 20,220–01, Findings of Fact and Conclusions of Law, at 4. The record supports such findings.

Specifically, James Smith's testimony at trial is duplicative. Smith testified that, while Smith was visiting Emery in his apartment in 1980 or 1981, Emery told Smith that he had stabbed a man down in Texas while he was burglarizing his apartment. He told Smith that he used a pass key to get into the apartment and was careful not to leave fingerprints by wiping any away with a handkerchief. He also told Smith that he threw his clothes in a dumpster behind the building in which he was living and later returned to the scene with Deborah Emery. In 1983, after the police had shown Smith pictures of the crime scene, Emery admitted to Smith that he had stabbed Muhlinghaus.

Marie Michaeloff's testimony at trial also duplicated that of Deborah Emery. Michaeloff testified that Emery was a friend of her friend Charles when she was living in Minneapolis in 1983. When Emery was arrested, her son had advised Emery to confide in Michaeloff so that she could advise him. Michaeloff testified that Emery told her that he went to an apartment to work on an air conditioner and noticed that it would be easy to steal something from the apartment because it was messy. He told Michaeloff that he had entered the apartment with a master key. He was looking around when he heard a noise at the door and he hid in a bedroom closet. He told Michaeloff that a girl entered and undressed. Emery told Michaeloff that he came up behind her and stabbed her in the back and the front until she fell. He then admitted to having sex with the corpse. He told Michaeloff that he was careful to wipe the fingerprints with a shirt and left through a window. Michaeloff testified that Emery said he wrapped the knife in a shirt and threw it down a sewer-type drain.

The record contains abundant evidence corroborating Emery's confession to Michaeloff, including the messiness of the bedroom where the victim was found, Emery's account of stabbing the victim in the back and front, the fact that Emery had fixed the air conditioner at the victim's apartment before the murder, Emery's exit through the window, the sexual intercourse with the victim's body, other sexual mutilation inflicted on the body, and Emery's belief that the maintenance man

saw him leaving the apartment. Because Deborah Emery's testimony concerning Emery's confession was duplicated by both Smith's and Michaeloff's testimony, Emery fails to demonstrate that trial counsel's decision to open the door to the admission of his confession to Deborah Emery prejudiced him. *See Romero v. Lynaugh,* 884 F.2d 871, 879 (5th Cir.1989), *cert. denied,* 494 U.S. 1012, 110 S.Ct. 1311, 108 L.Ed.2d 487 (1990) (holding petitioner failed to show *Strickland* prejudice when evidence for which counsel failed to block admission was duplicative of admissible evidence).

Moreover, Emery fails to demonstrate that the admission of privileged marital communications rendered his trial either unreliable or fundamentally unfair. *See Lockhart,* 506 U.S. at 369, 113 S.Ct. at 842. Emery argues that he was prejudiced because the testimony came from two bad characters. At the time he was interviewed by the police, Smith was wanted on two warrants, including one for escape, and cooperated with the police only after receiving a promise that, in exchange for his cooperation, he would not go back to jail. At the time of her testimony, Michaeloff was incarcerated in a federal penitentiary for theft and she had a prior state theft conviction.

Relying on Texas Rule of Criminal Evidence 511(1), Emery contends that trial counsel was mistaken in his opinion that, if he impeached Deborah Emery with discrepancies in her statements, the State might succeed in introducing Emery's marital communication admitting to the murder. Rule 511(1) provides that a person waives the marital communications privilege if he "voluntarily discloses or consents to disclosure of any significant part of the privileged matter." Emery argues that defense counsel could have cross-examined Deborah Emery about inconsistencies in her various descriptions of what she had observed about Emery on the night of the murder without disclosing or consenting to the disclosure of the confession itself. He claims that defense counsel only had to avoid questioning Deborah Emery about any part of her statement that pertained to privileged marital communications. Emery fails, however, to establish that trial

counsel's strategic decision was outside the range of reasonably professional assistance.

■ Furthermore, Texas Rule of Criminal Evidence 106 provides that when a party introduces part of a recorded statement, "an adverse party may at that time introduce any other part or any other ... recorded statement which ought in fairness to be considered contemporaneously with it." Additionally, Texas Rule of Criminal Evidence 107 provides that "[w]hen part of a ... recorded statement is given in evidence by one party, the whole on the same subject may be inquired into by the other." The doctrine of optional completeness embodied in these two rules guards against the possibility of confusion, distortion, or false impression that could arise from the use of only a portion of a statement out of context. *Livingston v. State,* 739 S.W.2d 311, 331 (Tex.Crim.App. 1987), *cert. denied,* 487 U.S. 1210, 108 S.Ct. 2858, 101 L.Ed.2d 895 (1988); *Roman v. State,* 503 S.W.2d 252, 253 (Tex.Crim.App. 1974). Furthermore, evidence used to fully explain a matter opened up by the other party need not be ordinarily admissible. *Parr v. State,* 557 S.W.2d 99, 102 (Tex.Crim. App.1977). However, an opposing party may not introduce portions of the statement that are wholly unrelated to the matter initially raised, but may present only those portions that explain and clarify the same subject. *Roman,* 503 S.W.2d at 254; *Allen v. State,* 493 S.W.2d 515, 516 (Tex.Crim.App.1973).

In light of the rule of optional completeness, Emery's trial counsel could not have been certain that, if he cross-examined Deborah Emery about inconsistencies between her statement and her testimony, he would not inadvertently open the door to the admission of her entire statement to police, including Emery's confession. *See Cerda v. State,* 557 S.W.2d 954, 956 (Tex.Crim.App.1977) (holding State permitted to read entirety of witness' written statement after defense counsel discredited witness by reading part of statement). Even though the State would have been permitted to present only those portions of the statement that explained and clarified the same subject gone into on cross examination, the trial court would have had to determine what constituted "the same sub-

ject." Although the state habeas court found that counsel's strategy may have been based in part on erroneous legal argument, the trial court did not rule that trial counsel could have impeached Deborah Emery without opening the door to the admission of privileged, marital communications.

Even assuming that trial counsel was mistaken in believing that he could not have attacked Deborah Emery's credibility without opening the door to the admission of Emery's marital communication, his trial strategy was not objectively unreasonable. *See Kyles v. Whitley,* 5 F.3d 806, 819 (5th Cir.1993), *rev'd on other grounds,* —— U.S. ——, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (stating trial counsel's performance not deficient even if decision based on mistake of law if action itself objectively reasonable). Defense counsel impeached Deborah Emery with regard to her descriptions of what Emery had told her, such as inconsistencies in the timing and contents of his various statements. In addition, if Emery insisted on testifying, the record indicates a clear possibility that Emery would have opened the door to the admission of confidential marital communications. In the affidavit accompanying his state habeas hearing regarded his planned testimony in response to his ex-wife's version of events, Emery wanted to testify that he wanted his wife to believe he committed the murder, and counsel therefore acted reasonably in anticipating that Emery would open the door to the marital communication and to introduce it himself sooner rather than later.

Under *Strickland,* a court must evaluate the reasonableness of trial counsel's conduct from counsel's perspective at the time of the representation, by reconstructing all of the relevant circumstances. 466 U.S. at 689–90, 104 S.Ct. at 2065–66. Respondent suggests the following circumstances at the time of trial: (1) Deborah Emery had not reported the murder to police until after filing for divorce from Emery and thus, defense counsel decided to attack her credibility and motive for testifying; (2) counsel believed that he could destroy the value of Emery's viable, mistaken identity defense if the jury sensed that he was hiding anything; (3) counsel was

aware that two other witnesses would testify that Emery had confessed to the murder, and one of the confessions was more detailed than the communication to Deborah Emery; (4) counsel anticipated that Emery would insist on taking the stand, and counsel knew that Emery had a tendency to ramble and propose obviously uncredible versions of events; (5) no authority compelled the trial court to rule that counsel could impeach Deborah Emery with inconsistent details from her statement without opening the door to the admission of the entire statement, including the marital communication.

In light of these factors, the Court agrees that it was not unreasonable for trial counsel to cross examine Deborah Emery regarding inconsistencies in her accounts of what Emery had said about the murder. By so doing, trial counsel avoided the risk that the State might succeed in introducing the marital communication first. Since the State would have introduced Emery's confessions to Smith and Michaeloff regardless, defense counsel's decision to elicit unfavorable information that may have come in anyway so as to appear honest and credible to the jury was not unreasonable. Defense counsel's performance was not deficient.

In short, Emery's ineffective assistance of counsel claim fails because he is unable to demonstrate that he was prejudiced. The marital communication evidence was cumulative of the testimony of two other witnesses. The admission of the marital communication did not render Emery's trial unreliable or fundamentally unfair.

■ Emery also claims that he did not receive effective assistance of counsel because defense counsel opened the door to the admission of evidence regarding Emery's extraneous bad acts and offenses during the guilt/innocence phase of the trial. Specifically, he claims that, by cross examining Deborah Emery regarding Emery's practice of committing passkey burglaries, trial counsel permitted the State to elicit testimony from Mitchell McGrady about how McGrady and Emery had stolen quarters from soft drink machines and used a key to get into a storeroom in order to steal television sets when the two of them worked at the Aggieland

Inn. Additionally, Emery complains that counsel failed to object when the State questioned McGrady about an incident in which Emery slapped Deborah Emery. Finally, Emery faults trial counsel for eliciting Deborah Emery's testimony that Emery had threatened to hurt her family if she ever revealed his involvement in the murder to police.

In the affidavit John Quinn submitted in the state habeas proceedings, he stated that he opened the door regarding extraneous offenses because he believed that they would eventually come into evidence through rebuttal through several potential witnesses. The state habeas court found as follows:

. . . .

35. As of the time Debbie Emery testified, the defense thought it was possible that Applicant would later testify, and not knowing what Applicant would testify to, that it was possible that Applicant's history of theft and burglary would be admitted eventually.

36. Given these possibilities, John Quinn thought it best to lessen the sting of the damaging evidence by eliciting it himself.

37. Applicant specifically wanted the jury to know that he was an experienced "passkey burglar," and therefore would not have committed this crime, given the evidence that there was nothing to steal in LaShan Muhlinghaus' apartment and that he would have known as much by having been in the apartment before.

38. John Quinn's decision to elicit evidence of the extraneous offenses and bad acts complained of by Applicant, was not an unreasonable strategy, given the other evidence implicating Applicant in the capital murder that was likely to be presented.

39. The Court does not find that the admission of the extraneous offenses and bad acts prejudiced the defense, given the other evidence implicating Applicant in the capital murder that was eventually presented.

40. John Quinn did not request an instruction to limit the jury's consideration of the evidence of extraneous offenses and bad acts. Such a request would have been denied by this Court because the evidence

of extraneous offenses and bad acts was initially introduced by the defense, except for that of wife beating.

41. The Court does not find that the failure to obtain a limiting instruction as to wife beating was prejudicial to Applicant, given its relative insignificance in the context of this case.

*Ex parte Emery,* Appl. No. 29,220–01, Findings of Fact and Conclusions of Law, at 5–7.

Part of Quinn's trial strategy was to elicit unfavorable evidence that he believed might come in anyway in order to appear candid and straightforward to the jury, and to deny the State the first opportunity to introduce such information. There was a distinct possibility that Emery would testify during the guilt/innocence phase, Quinn knew that Emery could open the door to his past offenses and bad acts and so Quinn decided to elicit this information himself sooner rather than later. This decision was reasonable.

In the affidavit Emery submitted in his state habeas proceeding, Emery stated that, had he testified, he would have wanted the prosecutor to question him on his criminal history as a pass-key burglar. Thus, based on his belief that Emery would insist on testifying, Quinn's decision to elicit information about pass key burglaries sooner rather than allowing it to come in later was not objectively unreasonable.

■ Emery's complaint that trial counsel's failure to request a limiting instruction constituted deficient performance is foreclosed by the state habeas court's conclusion that Emery would not have been entitled to such an instruction. *Ex parte Emery,* Appl. No. 29,220, Findings of Fact and Conclusions of Law at 7. Although Emery argues that the trial court's ruling was incorrect under state law, such a contention is immaterial on federal habeas review. A federal habeas court must defer to state court interpretations of state law. *See Estelle v. McGuire,* 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) ("[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions"); *Trussell v. Estelle,* 699 F.2d 256, 259 (5th Cir.), *cert. denied,* 464 U.S. 853, 104 S.Ct. 168, 78 L.Ed.2d 153 (1983) ("We may not consider

the correctness of the evidentiary rulings of the Texas courts").

■ Moreover, Emery has failed to prove that he was prejudiced either by counsel's decision to question Deborah Emery regarding pass-key burglaries or by counsel's failure to request a limiting instruction. Other evidence supported the argument that Emery obtained entry to LaShan Muhlinghaus' apartment with a pass key, including Emery's revelation of this detail to James Smith and Marie Michaeloff and the testimony of Darrell Parker, who testified that he and Emery had access to pass keys for Travis House Apartments. Thus, Emery fails to show a reasonable probability of a different outcome based on the admission of the challenged evidence. Further, he has not shown that the admission of such evidence rendered his trial unreliable or fundamentally unfair, and he is not entitled to relief.

■ Emery also claims that the defense counsel improperly introduced evidence regarding threats made by Emery against his ex-wife and her family. According to the state habeas court's fact findings on this issue, defense counsel knew that if he attacked Deborah Emery's credibility on the basis that she did not report Emery to police until after filing for divorce, the State would be allowed to explain the delay with her testimony that Emery had threatened her. Emery argues that his threat was a privileged, martial communication that could not have been revealed on redirect examination. The only Texas court that has addressed the question has held that a husband's threats against his wife do not qualify as confidential marital communications. *Weaver v. State,* 855 S.W.2d 116, 121 (Tex.App.—Houston [14th Dist.] 1993). Also, Emery concedes that the State could have elicited Deborah Emery's testimony about specific violent incidents that caused her fear.

■ Emery also faults trial counsel for failing to object to Mitch McGrady's testimony that he had observed Emery slap Deborah Emery in the face. However, Emery acknowledges that the State could have elicited evidence of Emery's specific acts of vio-

lence against Deborah Emery to explain her fear of him, and consequent delay in reporting him to police. The record demonstrates that this is exactly the purpose for which the State elicited such testimony. Thus, by questioning Deborah Emery's claim that she feared Emery, trial counsel had opened the door to the admission of McGrady's testimony about the incident of domestic violence, and any objection would have been futile. *See Clark v. Collins,* 19 F.3d 959, 966 (5th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 432, 130 L.Ed.2d 344 (1994) (noting failure to assert meritless objections not ineffective).

In short, Emery fails to establish that counsel's strategic decision to elicit Deborah Emery's testimony about pass key burglaries and Emery's threat was either objectively unreasonable or that it prejudiced him. Trial counsel cannot be termed deficient or ineffective for failing to make a meritless objection to Mitch McGrady's testimony about Emery slapping Deborah Emery, and the admission of such testimony did not prejudice Emery under *Strickland.*

 Emery asserts that he was deprived of the right to testify in his own behalf and the right to effective assistance of counsel. Specifically, he claims that trial counsel coerced him into remaining silent by threatening to walk out of the courtroom if Emery insisted on testifying. He claims that such conduct violated his fifth, sixth, and fourteenth amendment rights. This claim is not barred from federal habeas review.

 A criminal defendant has a fundamental constitutional right to testify on his own behalf. *Rock v. Arkansas,* 483 U.S. 44, 49–52, 107 S.Ct. 2704, 2707–09, 97 L.Ed.2d 37 (1987). A defendant's right to testify on his own behalf is both fundamental and personal to the defendant and any waiver of the right must be knowing, intelligent and voluntary. *Jordan v. Hargett,* 34 F.3d 310, 312 (5th Cir.1994), *citing United States v. Teague,* 953 F.2d 1525, 1532 (11th Cir.1992). The right to testify is personal to the defendant and violated if the final decision not to testify is made against the defendant's will. *Id.* However, a defendant's right to testify does not include the right to testify falsely. *Nix v. Whiteside,* 475 U.S. 157, 173, 106 S.Ct. 988,

997, 89 L.Ed.2d 123 (1986). Moreover, defense counsel is not ineffective on the grounds that he dissuaded a client from committing perjury by a threat to withdraw. *Id.* at 173–75, 106 S.Ct. at 997–98. In *Nix,* the Court stated: "For defense counsel to take steps to persuade a criminal defendant to testify truthfully, or to withdraw, deprives the defendant of neither his right to counsel nor the right to testify truthfully.... When an accused proposes to resort to perjury or to produce false evidence, one consequence is the risk of withdrawal of counsel." 475 U.S. at 173–74, 106 S.Ct. at 997–98.

The state habeas court's presumptively correct findings of fact are dispositive with respect to Emery's claim that his decision not to testify was involuntary and his challenge to the effectiveness of trial counsel's assistance. *See Jordan,* 34 F.3d at 312 (holding determination of voluntariness of decision not to testify, as well as underlying determinations, are findings of fact). The findings, made by the judge of the convicting court, establish that there is no factual support for Emery's assertion that his decision not to testify was coerced or anything less than voluntary. The trial court's findings of fact include the following:

1. Applicant did not testify before the jury at any phase of his trial.

2. Applicant's decision not to testify was not the result of pressure, force or coercion by either of his trial lawyers.

3. Applicant understood that he had a right to testify at his trial.

4. Applicant's decision not to testify was made freely and voluntarily.

5. John Quinn strongly encouraged Applicant not to testify because he reasonably believed that Applicant's testimony would damage the defense.

6. John Quinn believed that Applicant would not stand up to a thorough cross-examination by District Attorney Bill Turner.

7. John Quinn believed that the jury would not find Applicant credible.

8. John Quinn believed that Applicant's testimony might have negated the defense

that another person named Robert Combs had committed the murder.

9. John Quinn was not certain what Applicant's testimony would be, because Applicant had told John Quinn conflicting versions of what happened on the night of the murder.

10. John Quinn's legal advice for Applicant not to testify was reasonable.

11. John Quinn told Applicant that if Applicant took the stand, Quinn would walk out of the courtroom, but the Court does not find that this coerced the Applicant not to testify.

12. John Quinn made the above statement because John Quinn reasonably believed that Applicant would commit perjury if he testified.

13. John Quinn formed this belief in part because Applicant told him that he killed LaShan Muhlinghaus because they were lovers and Ms. Muhlinghaus threatened to tell Applicant's wife about the affair, but also said, when explaining how he became covered in blood on the night of the murder, that he had stabbed a man who had been trying to break into Applicant's car.

14. John Quinn reasonably believed that Applicant was simply testing different false versions, in order to see which one would seem more credible to a jury.

*See Ex parte Emery,* Appl. No. 29,220–21, Findings of Fact and Conclusions of Law.

Contrary to Emery's assertion, the trial and state habeas records reveal that, although Emery attributed his first conviction of the instant capital offense to his silence at trial and was thus inclined to testify at the retrial, Emery ultimately heeded counsel's advice and made a voluntary decision not to testify. In the state habeas proceedings, Quinn submitted two affidavits. The first affidavit states that Quinn told Emery that, if he insisted on testifying, Quinn intended to walk out of the courtroom without explaining his absence to the court. Quinn also stated that he was concerned that he may have unduly influenced Emery's decision not to testify, although the decision appeared to be voluntarily made. Quinn stated that he was sure that Emery planned to lie on the witness stand, that Emery was not credible, and

that Emery could not withstand cross-examination by the district attorney. Although Quinn could not specify what Emery would lie about, he believed that Emery would commit perjury due to the different stories that Emery would provide to explain his lack of involvement in the murder. For example, Emery had told Quinn that he had stabbed a black male who was attempting to break into Emery's car with a screwdriver. Emery also told Quinn that he and Muhlinghaus were having an affair. When Quinn told him that a jury would not believe that he and the victim were romantically involved, Emery indicated that they should stick to the story in which he apprehends the black male. Consequently, Quinn repeatedly advised Emery not to take the witness stand.

The affidavit submitted by Emery in the state habeas proceedings supports the trial court's findings. Emery's affidavit states that Quinn had advised Emery during the guilt or innocence phase of his trial not to testify in his own defense. Emery states that he took Quinn's advise as legal counsel because he had limited legal knowledge of the ramifications of either testifying or not testifying on his own behalf. He states that he repeatedly informed Mr. John T. Quinn of his desire to testify at the guilt and innocence phase of my trial, and repeatedly, he talked him out of doing so. Emery's affidavit does not mention Emery's threat to walk out if Emery testified. Further, a colloquy between Emery and Quinn suggests that Emery knowingly and voluntarily waived his right to testify. In *Jordan,* the Fifth Circuit noted that the "undercertainty" in this area is avoided if trial courts conduct a colloquy and "obtain, outside of the jury's hearing, a statement on the record from the non-testifying defendant that the is aware of his right to testify and has chosen voluntarily to waive that right." 34 F.3d at 314. Even when the record is silent regarding the defendant's wish to testify, there is a rebuttable presumption that the defendant acquiesced in his counsel's advice or otherwise made a voluntary choice not to testify. *Id.* In short, the record in the proceedings below does not suggest that Emery was forced not to testify

or that he did not voluntarily waive his right to testify.

 Emery complains that trial counsel's conduct in convincing him not to testify constituted ineffective assistance. "[T]he decision whether to put a Defendant on the stand is a 'judgment call' which should not easily be condemned with the benefit of hindsight." *United States v. Garcia,* 762 F.2d 1222, 1226 (5th Cir.1985). As the State argues, the record demonstrates that counsel had sound strategic reasons for advising Emery not to testify, such as his belief that Emery would perjure himself, that he would not stand up to cross examination, that the jury would not find Emery credible, and that Emery would negate the Robert Combs defense. *See Ex parte Emery,* Appl. No. 29,220–21, Findings of Fact and Conclusions of Law. Quinn's advice was reasonable and he therefore cannot be termed ineffective for reasonably advising Emery not to testify. *See United States v. Garcia,* 762 F.2d at 1226 (5th Cir.), *cert. denied,* 474 U.S. 907, 106 S.Ct. 238, 88 L.Ed.2d 239 (1985); *Hollenbeck v. Estelle,* 672 F.2d 451, 454 (5th Cir.), *cert. denied,* 459 U.S. 1019, 103 S.Ct. 383, 74 L.Ed.2d 514 (1982). Neither can Emery show that he was prejudiced by the absence of his proposed testimony. *See United States v. Phillips,* 664 F.2d 971, 1041–42 (5th Cir.1981), *cert. denied,* 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982).

 Finally, Emery claims that the Texas capital sentencing scheme failed to provide the jury with any vehicle by which to give mitigating effect to evidence of Emery's childhood abuse. This claim is not barred from federal habeas review. Emery's death sentence is based upon the jury's unanimous affirmative responses to the following two statutory punishment phase issues:

> (1) Was the conduct of the defendant, Jeff Emery, that caused the death of the deceased, LaShan Muhlinghaus, committed deliberately and with the reasonable expectation that the death of the deceased or another would result?
>
> (2) Is here a probability that the defendant, Jeff Emery, would commit criminal acts of violence that would constitute a continuing threat to society?

Trial 225–26. The State argues that there is no reasonable likelihood that the jury found itself foreclosed from considering the mitigating aspects of Emery's evidence of child abuse in answering the special issues and thus, his claim must fail.

 Emery relies on *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). The eighth amendment demands that a capital sentencing verdict reflect a "reasoned moral response" to the defendant's mitigating evidence. 492 U.S. at 323, 109 S.Ct. at 2949. In *Penry,* the Court acknowledged that the eighth amendment requires that the mitigating value of constitutionally relevant evidence, as actually proffered at trial, remain within the effective reach of the jury in responding to statutory punishment issues and instructions. *Johnson v. Texas,* 509 U.S. 350, 367–69, 113 S.Ct. 2658, 2669, 125 L.Ed.2d 290 (1993); *Penry,* 492 U.S. at 323, 109 S.Ct. at 2949; *Graham v. Collins,* 506 U.S. 461, 475–77, 113 S.Ct. 892, 902, 122 L.Ed.2d 260 (1993). Mitigating evidence is beyond the sentencer's effective reach only if there exists a reasonable likelihood that in answering the special punishment issues, the jury would have found itself foreclosed from considering mitigating aspects of the evidence. *Johnson,* 509 U.S. at 368, 113 S.Ct. at 2669. The reviewing court must "approach the instruction in the same way that the jury would—with a 'commonsense understanding of the instructions in the light of all that has taken place at the trial.'" *Johnson,* 509 U.S. at 368, 113 S.Ct. at 2669, *quoting Boyde v. California,* 494 U.S. 370, 381, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990). There is no requirement that a jury be allowed to give effect to mitigating evidence in every conceivable manner in which the evidence might be relevant. *Id.* 509 U.S. at 372–73, 113 S.Ct. at 2671. If mitigating evidence is within the effective reach of the jury, the fact that a defendant can identify mitigating value beyond the scope of the statutory issues does not require the submission of an additional issue or instruction allowing the jury to give further mitigating effect to the evidence. *Id.; Graham,* 506 U.S. at 475–76, 113 S.Ct. at 902.

There is little question that the punishment charge provided an adequate vehicle for the jury to give mitigating effect to evidence of Emery's history of childhood abuse. In addition to the two special punishment issues, the trial court charged the jury as follows:

> When you deliberate about the questions posed in the Special Issues, you are to consider any mitigating circumstances supported by the evidence presented in both phases of the trial. *A mitigating circumstance may be any aspect of the defendant's background, character, and record,* or circumstances of the crime, which you believe makes a sentence of death *inappropriate* in this case. If you find there are any mitigating circumstances, you must decide how much weight they deserve and give them effect when you answer the special issues. *If you determine, in consideration of this evidence, that a life sentence, rather than a death sentence is an appropriate response to the personal moral culpability of the defendant, you are instructed to answer the Special Issue under consideration "No".* You need not agree on what particular evidence supports a "No" answer.

Trial 222 (emphasis added). The trial court instructed the jury to answer one of the special issues "no" if it concluded from any mitigating circumstances that Emery deserved a life sentence rather than death. In addition, defense counsel explained to the jury during the punishment phase how to give effect to any mitigating evidence, i.e., an abusive background, in assessing punishment. This conclusion is consistent with the holding of the state habeas court. *See Emery*, 881 S.W.2d at 712. In short, the jurors were not foreclosed from considering the mitigating aspects of Emery's evidence of childhood abuse in answering the special punishment issues.

### III.

To summarize, the Court finds that it lacks jurisdiction over the following claims: (1) trial counsel rendered ineffective assistance of counsel in failing to object to the definition of "intentional" included in the court's charge; (2) prosecutorial misconduct regarding the conditions of Emery's confinement violated his fifth, sixth, and fourteenth amendment rights; (3) the State used Fred Zain to conduct DNA testing in violation of Emery's sixth amendment right to counsel and fourteenth amendment right to due process; (4) Emery's death sentence violates his eighth and fourteenth amendment rights because each local prosecuting attorney has the unreviewable discretion to seek the death penalty or a life sentence in a capital murder prosecution; (5) the imposition of the death penalty violates Emery's eighth amendment rights because Texas law irrationally exempts those with two or more prior felony convictions from eligibility to receive the death penalty; and (6) Emery was deprived of his sixth amendment right to counsel and effective assistance of counsel by his trial attorney's threat the walk out of the courtroom if Emery testified. Accordingly, the Court ORDERS that aforementioned claims are DISMISSED.

The Court further finds that the respondent is entitled to summary judgment on all remaining claims. Accordingly, Respondent's motion for summary judgment is GRANTED. Petitioner's application for a writ of habeas corpus is DISMISSED.

This Court finds that a certificate of probable cause should be granted in this case. Fed.R.App.P. 22(b). A certificate of probable cause requires the petitioner to make a substantial showing of the denial of a federal right. *Barefoot v. Estelle*, 463 U.S. 880, 893, 103 S.Ct. 3383, 3394, 77 L.Ed.2d 1090 (1983); *Drew v. Collins*, 5 F.3d 93, 95 (5th Cir.1993). Petitioner need not demonstrate that he will prevail on the merits, but must demonstrate that the issues are debatable among reasonable jurists; that a court *could* resolve the issues in a different manner. *Barefoot*, 463 U.S. at 893 n. 4, 103 S.Ct. at 3394 n. 4. After careful review of the facts and authorities, this Court finds that a certificate of probable cause should be issued on all claims in this case.

This is a **FINAL JUDGMENT.**