**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 96-20826
_____

JEFF EMERY,

Petitioner-Appellant,

VERSUS

GARY JOHNSON, Director,
Texas Department of Criminal Justice,
Institutional Division

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Texas
_____
September 10, 1997

Before KING, SMITH, BENAVIDES, Circuit Judges.

JERRY E. SMITH, Circuit Judge:


Jeff Emery, proceeding *in forma pauperis*, appeals the denial of his petition for writ of habeas corpus.  Concluding that several of his claims are barred by procedural default and that the others are without merit, we affirm and vacate the stay of execution.


I.

A.

One day in 1979, LaShan Muhlinghaus returned to her apartment and undressed.  Unbeknownst to her, Emery, an accomplished burglar,

had entered her apartment using a stolen pass key. When Muhlinghaus entered the apartment, Emery hid in her roommate's closet.

Muhlinghaus went into her roommate's bedroom to return a dress she had borrowed. Emery attacked Muhlinghaus, stabbing her twenty-five times. After she was dead, Emery had sexual intercourse with her body. The police did not find any evidence that Emery stole anything.

Emery returned to the house where he lived with his wife, Deborah Emery ("Deborah"). After showering and disposing of his blood-stained knife and clothes, Emery drove to the scene of the crime with Deborah to observe the police investigation. Emery confessed his actions to his wife and later to James Smith, his foster brother, and Marie Michaeloff.

Emery assaulted his wife at least every other day. Although he usually hit her with his fists, he occasionally used a metal bar, ashtrays, nicknacks, and lighters. He also would pound her head on the bathtub. At least once, he hit her child, who was a toddler, across the room. Finally, in July 1982, Deborah began divorce proceedings. Five months later, she reported Emery's crimes to the police.

## B.

Emery was convicted of capital murder during the commission of a burglary, *see* TEX. PEN. CODE ANN. § 19.03(a)(2) (Vernon 1994), and was sentenced to death in 1986. The Texas Court of Criminal

2

Appeals reversed because portions of the trial transcript had been stolen. *See Emery v. Texas*, 800 S.W.2d 530 (Tex. Crim. App. 1990) (en banc).

The state retried Emery and obtained a second conviction, whereupon the jury sentenced him to death in 1991. On appeal, Emery unsuccessfully argued, *inter alia*, that the jury instructions at the penalty phase were inadequate because they did not allow the jury to consider all relevant mitigating evidence. *See Emery v. Texas*, 881 S.W.2d 702, 711-12 (Tex. Crim. App. 1994), *cert. denied*, 513 U.S. 1192 (1995).

C.

In 1995, Emery filed his first state habeas petition, arguing, *inter alia*, that his right to testify on his own behalf had been denied and that his counsel rendered ineffective assistance by opening the door to the admission of his confession to Deborah and his history of burglary and by not objecting to the introduction of evidence that he slapped his wife. The state habeas trial court conducted an evidentiary hearing and issued various findings of fact.[1] The Texas Court of Criminal Appeals denied the habeas petition on the merits in August 1995.

In November 1995, Emery filed a second state habeas petition,

---

[1] In Texas, all post-conviction habeas petitions are decided by the Court of Criminal Appeals. *See* TEX. CODE CRIM. PROC. ANN. art 11.07, § 2(a) (Vernon Supp. 1994) (amended 1995) (current version at TEX. CODE CRIM. PROC. ANN. art 11.07, § 3 (Vernon Supp. 1997)). When a habeas petition requires the resolution of questions of fact, the state trial court that rendered the conviction performs the fact-finding function. *See id.* § 2(c). The decision whether to issue the writ still remains with the Court of Criminal Appeals.

raising several new issues, including general challenges to Texas's death penalty scheme and new claims of ineffective assistance based on counsel's having convinced Emery not to testify and having not objected to a particular part of the jury charge. While that petition was pending, Emery filed the instant federal habeas petition.

Texas follows the rule that a state prisoner may seek habeas relief in state or federal court, but not both. Consequently, the Texas courts refuse to consider a habeas petition while a federal petition is pending. *See Ex parte Green*, 548 S.W.2d 914, 916 (Tex. Crim. App. 1977). In February 1996, the Court of Criminal Appeals invoked this principle and dismissed Emery's second state habeas petition. In August 1996, the federal district court denied Emery relief on all his claims but granted a certificate of probable cause ("CPC") to appeal. *See Emery v. Johnson*, 940 F. Supp. 1046, 1065 (S.D. Tex. 1996).[2]

II.

A.

Our analysis of the claims that Emery raised only in his second state habeas petition is complicated by the doctrine of

_____

[2] Section 102 of the Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996, Pub. L. No. 104-132, 110 Stat. 1214, 1217-18 (1996), amended 28 U.S.C. § 2253 to require a "certificate of appealability" before a final order in a habeas proceeding can be appealed. Because Emery filed his habeas petition in 1995, well before the effective date of the AEDPA, this new requirement does not apply to him, and the grant of a CPC is sufficient to vest jurisdiction in this court. *See Shute v. Texas*, 117 F.3d 233, 236 n.1 (5th Cir. 1997) (on rehearing). Similarly, the new standards of review contained in § 104 of the AEDPA, 110 Stat. at 1218-19, do not apply to this petition. *See Green v. Johnson*, 116 F.3d 1115, 1119-20 (5th Cir. 1997).

4

procedural default.  A federal court may not consider a state prisoner's constitutional claim if the state courts based their rejection of that claim on an adequate and independent state ground.  *See Martin v. Maxey*, 98 F.3d 844, 847 (5th Cir. 1996).  It is not always easy, however, to determine whether a state court decision denying collateral relief is based on state procedural grounds or, instead, on the court's interpretation of federal law.  The Supreme Court has supplied us with a useful default rule:  We will not apply a procedural default unless the last state court to consider a particular claim "clearly and expressly" relied on an independent and adequate state ground.  *Coleman v. Thompson*, 501 U.S. 722, 735 (1991).

This default rule does not apply, however, "if the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred."  *Id.* at 735 n.*.  In such a case, "there is a procedural default for purposes of federal habeas regardless of the decision of the last state court to which the petitioner actually presented his claims."  *Id.*

B.

1.

The federal district court reasoned that Emery's claims were procedurally barred because, if he tried to exhaust them in a proper manner, they would be barred by TEX. CODE CRIM. PROC. ANN.

5

art. 1.071, § 5(a) (Vernon Supp. 1997), which prohibits the filing of subsequent or untimely habeas applications, absent cause or actual innocence.[3] *See Ex parte Davis*, 947 S.W.2d 216 (Tex. Crim. App. 1996) (en banc) (upholding the constitutionality of article 11.071). In a habeas context, we review the district court's determinations of law *de novo* and its findings of facts for clear error. *See Dison v. Whitley*, 20 F.3d 185, 186 (5th Cir. 1994).

Because article 11.071 is a new statute that is largely uninterpreted by state cases, we instead consider whether we should affirm on the basis of the abuse-of-the-writ doctrine. We may affirm a judgment on any ground supported by the record. *See Mangaroo v. Nelson*, 864 F.2d 1202, 1204 n.2 (5th Cir. 1989).[4]

A second habeas petition is an abuse of the writ if the prisoner urges grounds that could have been, but were not, raised in his first habeas petition. *See Russell v. Collins*, 944 F.2d 202, 205 (5th Cir. 1991) (per curiam). Such a doctrine, which the federal courts recognize, encourages efficient justice by requiring a prisoner to present all claims for relief at once. *See McClesky v. Zant*, 499 U.S. 467, 493 (1991). The Texas courts have recognized this doctrine for over twenty years. *See, e.g.,*

---

[3] Article 11.071 applies only to capital cases, but TEX. CODE CRIM. PROC. ANN. art. 11.07, § 4 (Vernon Supp. 1997), adopts the same rule for non-capital felony convictions.

[4] If the state does not plead procedural default in the district court, it is waived. *See United States v. Marcello*, 876 F.2d 1147, 1153 (5th Cir. 1989). We have recognized a limited exception to this rule when one state implicitly waives the default of *a different state's* procedural rule. *See Trest v. Whitley*, 94 F.3d 1005, 1007-09 & n.2 (5th Cir. 1996), *cert. granted sub nom. Trest v. Cain*, 117 S. Ct. 1842 (1997). Although the district court did not rely on the abuse-of-the-writ doctrine in finding a procedural default, the state urged this ground both on appeal and before the district court.

*Ex parte Carr*, 511 S.W.2d 523, 525-26 (Tex. Crim. App. 1974).

An abuse of the writ can qualify as a procedural bar. *See Murch v. Mottram*, 409 U.S. 41, 45-46 (1972) (per curiam). A procedural bar is not adequate, however, unless it is applied "strictly or regularly" to the "*vast majority of similar claims.*" *Amos v. Scott*, 61 F.3d 333, 339 (5th Cir.), *cert. denied*, 116 S. Ct. 557 (1995). Historically, Texas courts have failed to apply the abuse-of-the-writ-doctrine in a strict or regular manner, and, therefore, we have refused to honor it. *See Lowe v. Scott*, 48 F.3d 873, 876 (5th Cir. 1995).

This changed in 1994, when the Texas Court of Criminal Appeals announced the adoption of a strict abuse-of-the-writ-doctrine, tempered only by an exception for cause. *See Ex parte Barber*, 879 S.W.2d 889, 891 n.1 (Tex. Crim. App. 1994) (en banc) (plurality opinion). *Barber* represents an adequate procedural bar for purposes of federal habeas review. *See Fearance v. Scott*, 56 F.3d 633, 642 (5th Cir. 1995).

Emery has not cited any post-*Barber* case allowing an abusive writ, and our research has revealed none. Therefore, we are bound to follow *Fearance* and to hold that Emery's violation of Texas's abuse-of-the-writ-doctrine constitutes an independent and adequate procedural bar to our consideration of his barred claims.[5]

2.

---

[5] Emery filed a motion to certify to the Court of Criminal Appeals certain questions concerning the interpretation and application of article 11.071. Because our decision does not rely on that article, we deny this motion as moot.

7

A petitioner may overcome a procedural default by showing cause and prejudice for that default. *See Tucker v. Johnson*, No. 97-20101, 1997 WL 367348, at *4 (5th Cir. July 2, 1997) (on petition for rehearing). Emery argues that his failure to anticipate the passage of article 11.071 constitutes cause for his failure to plead all his grounds for relief in his first habeas petition.

Emery filed his first state habeas petition in July 1995, over one year after *Barber* was decided, so he cannot claim ignorance of his duty to plead all his grounds for relief during his first petition for collateral review. Therefore, he has shown no cause for his violation of Texas's abuse of the writ doctrine.

### III.

### A.

Emery raises several ineffective-assistance-of-counsel claims. To establish ineffective assistance, he must demonstrate both deficient performance by his counsel and prejudice resulting from that deficiency. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).

We compare counsel's performance to an objective standard of reasonableness, mindful of the strong presumption of adequacy. We will not find inadequate representation merely because, with the benefit of hindsight, we disagree with counsel's strategic choices. *See Garland v. Maggio*, 717 F.2d 199, 206 (5th Cir. 1983) (on petition for rehearing). To establish prejudice, Emery must

8

demonstrate that counsel's errors "render the verdict fundamentally unfair or unreliable." *Carter v. Johnson*, 110 F.3d 1098, 1110 (5th Cir. 1997).[6]   Specifically, he must "show a 'reasonable probability' that the jury would have otherwise harbored a reasonable doubt concerning guilt." *Id.*

B.

1.

Emery's first ineffectiveness claim concerns his counsel's questioning Deborah about his confession, thus waiving the marital privilege, *see* TEX. R. CRIM. EVID. 504(1), and allowing the admission of the confession.  Explaining this claim requires some exploration of its factual background.

Under Texas law, the marital privilege extends only to confidential communications, not observed acts.  *See Sterling v. Texas*, 814 S.W.2d 261, 261-62 (Tex. App.§§Austin 1991, writ ref'd) (per curiam).  Deborah testified that Emery returned to the house shortly after the murder with a blood-stained knife and blood-stained underpants and "had blood on his arms, smeared on his arms and his hands, on his shirt, and his pants, and some on his work boot."  She testified that Emery drove her to the site of the murder to watch the investigation and that Emery told James Smith that he had killed a man in Texas and instructed Smith to request

_____

[6] Although *Murphy* and *Carter* were influenced by our erroneous view of the applicability of the AEDPA to cases pending when the act became effective, they remain precedent to the extent that they "'do[] not conflict with *Lindh*'s conclusion that the chapter 153 amendments do not apply retroactively.'" *Tucker*, 1997 WL 367348, at *3 n.4 (quoting *Green*, 116 F.3d at 1120 n.2).

9

verification from Debbie.

Impeaching this testimony was vital to Emery's defense of mistaken identity. John Quinn, his counsel, feared that an effective cross-examination would open the door to Deborah's testimony about Emery's confession. Furthermore, at that time, Emery still intended to testify. Quinn feared that Emery would make statements that would waive the privilege and allow the admission of the confession.

To be successful, the mistaken-identity theory required the defense to obtain a high degree of credibility with the jury. Consequently, one of counsel's strategic priorities was to be honest and straightforward. Accordingly, Quinn wanted to introduce, and lessen the impact of, any incriminating evidence that the prosecution might present.

2.

Emery argues that Quinn was incorrect in his belief (1) that Emery would testify and (2) that an effective cross-examination would open the door to the admission of Emery's confession. It is difficult to determine whether Quinn was correct in the latter belief. The record reveals that the most effective portion of the cross-examination was Quinn's careful and detailed analysis of the inconsistencies among Deborah's various statements to the police. Whether the Texas Rules of Criminal Evidence[7] would have required

---

[7] *See* TEX. R. CRIM. EVID. 106 ("When a writing or recorded statement or part thereof is introduced by a party, an adverse party may at that time introduce any (continued...)

the admission of Deborah's entire statement, including her report of Emery's confession, is an open question.

We need not resolve this issue of state evidentiary law. The Sixth Amendment does not guarantee criminal defendants the right to error-free representation. *See Skillern v. Estelle*, 720 F.2d 839, 851 (5th Cir. 1983). Standing alone, counsel's erroneous judgment, if any, about the requirements of state law does not constitute deficient performance unless it is so unreasonable that it rebuts the strong presumption that counsel's performance "falls within the wide range of reasonable professional assistance." *Washington*, 466 U.S. at 689.

Quinn's judgment that an effective cross-examination of Deborah would have been impossible without opening the door to the admission of the confession was reasonable. Similarly, as explained in more detail *infra*, Quinn's belief that Emery would testify and open the door to that confession also was reasonable. These reasonable judgments, even if ultimately erroneous, satisfy the standard for effective assistance of counsel.

3.

In any event, Emery has not demonstrated prejudice. At trial, both Smith and Michaeloff testified that Emery had confessed to

---

(...continued)
other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it."); TEX. R. CRIM. EVID. 107 ("When part of an act, declaration, conversation, writing or recorded statement is given in evidence by one party, the whole on the same subject may be inquired into by the other . . . .").

them.  Although Emery originally told Smith that he had stabbed a man, he later identified Muhlinghaus in a picture.  Michaeloff recounted a confession that was far more detailed and accurate than that reported by Deborah.

In short, Deborah's testimony about the confession was duplicative of testimony given by Smith and Michaeloff.  Emery cannot demonstrate that a third source of the same confession would have sufficed to change the result of his trial.[8]  The lack of prejudice is an alternative ground for denying Emery relief on this claim.


C.

Emery's second ineffectiveness claim is akin to the first. Quinn questioned Deborah about Emery's practice of committing pass key burglaries, opening the door to Mitchell McGrady's testimony about Emery's stealing quarters and televisions.  Emery argues that, by opening the door to the admission of this evidence of an extraneous act, Quinn rendered ineffective assistance.

According to Emery's affidavit, he intended to testify about his criminal history as a pass key burglar.  His theory was that, as an experienced burglar, he would not have entered Muhlinghaus's home, as it contained nothing worth stealing.  At the time that Deborah testified, Emery still intended to take the stand.

As mentioned above, Quinn's trial strategy required him to

---

[8] *Cf. Romero v. Lynaugh*, 884 F.2d 871, 879 (5th Cir. 1989) (holding that a prisoner failed to establish prejudice from the admission of cumulative evidence).

12

maintain credibility by not appearing to have anything to hide. Furthermore, Quinn reasonably believed that it was better strategy to vet damaging information himself, rather than allowing the prosecution to introduce it. It is not our province, on habeas review, to second-guess counsel's strategic choices.

Finally, Emery argues that Quinn was ineffective for not requesting a limiting instruction for this evidence. We must reject this argument, as the state trial court stated that it would not have granted such a limiting instruction, because the defense introduced the evidence. Although Emery argues that this is an incorrect interpretation of state law, "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

D.

Emery's third ineffectiveness claim concerns Quinn's failure to object when the prosecution questioned McGrady about Emery's slapping Deborah. This claim is easily dismissed.

As we have explained, a successful defense required impeaching Deborah's testimony. Part of the cross-examination centered on Deborah's delay in reporting Emery's crime. Deborah stated that the delay was caused by her fear of Emery. Consequently, Emery's slapping Deborah was admissible to show the reasonableness of her fear. Objection to its admission would have been futile, and failure to assert a meritless objection cannot be grounds for a

13

finding of deficient performance.  *See Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994).

Regarding Quinn's failure to request a limiting instruction that this evidence not be considered for general criminal propensity, Emery has not even argued that the lack of that instruction rendered the trial fundamentally unfair or unreliable. We conclude that Emery was not prejudiced by this failure.

IV.

A.

Emery alleges that he was denied the right to testify at trial.  A criminal defendant has a constitutional right to testify on his own behalf.  *See Rock v. Arkansas*, 483 U.S. 44, 49-53 (1987).  This right can be waived only by the defendant, not by his counsel.  *See United States v. Teague*, 953 F.2d 1525, 1532 (11th Cir. 1992) (en banc).  A waiver of this right must be knowing and voluntary.  *See United States v. Blum*, 65 F.3d 1436, 1444 (8th Cir. 1995), *cert. denied*, 116 S. Ct. 824 (1996).

Emery did not testify at his first trial.  Because he was convicted there, he was convinced that he should do everything in the second trial differently.  At the beginning of the trial, he informed his counsel that he wished to testify.

Emery and Quinn discussed his testimony several times during the trial.  Emery told Quinn radically different versions of what happened the night of the murder.  For example, at one point, he told Quinn that he had stabbed a black male using a screwdriver to

14

break into Emery's car, and that was why he was covered with blood.

Somewhat later, Emery informed Quinn that he had met Muhlinghaus in a bar and eventually had an affair with her. He stated that he killed her to prevent her from exposing the adultery to his wife. When Quinn informed him that the jury was unlikely to believe that story, Emery suggested returning to the "screwdriver in the parking lot story." Faced with these conversations, Quinn reasonably believed that Emery intended to commit perjury. Because of this, he threatened to leave the courtroom if Emery insisted on testifying.

In addition, Quinn believed that Emery would not stand up well to cross-examination, that the jury would not believe him, and that his testimony would negate the defense theory of mistaken identity. Quinn's co-counsel agreed with his assessment of the wisdom of testifying but did not threaten to leave the courtroom.

The night before Emery would have testified, his counsel finally managed to convince him not to do so. At trial the next day, Quinn engaged in a lengthy colloquy with Emery, explaining to him that he had the right to testify regardless of counsel's advice. Emery stated on the record that he understood his rights and that he was voluntarily declining to testify.

## B.

The state habeas court made a factual finding that Emery understood his rights and that Quinn's threats did not coerce Emery into not testifying. Absent a procedural defect in the state

15

habeas proceeding, the state court's factual findings are presumed to be correct unless they are "not fairly supported by the record." 28 U.S.C.A. § 2254(d)(8) (West 1994). Although Emery makes the bold statement that the record is devoid of evidence that his decision about testifying was not based on Quinn's "threat," we note that this factual finding is supported not only by Quinn's affidavit but by Emery's own statements under oath.[9]

Our review of the record reveals a great deal of evidence that Emery understood his right to testify and that his decision not to do so was based on Quinn's persuasion and not his coercion. In addition to the statements of Quinn and Emery, we note that Quinn's absence during Emery's testimony would have caused him little harm, as Quinn's co-counsel intended to remain in the courtroom and perform the defense duties. There also is considerable evidence in the record that Emery was very strong-willed and unlikely to allow his decisions to be controlled by pressure from other persons.

Because we find sufficient support in the record, we are bound by the state court's factual findings. Considering that Emery understood his right to testify and that Quinn's actions did not coerce him into not doing so, Emery's right to testify was not violated.

---

[9] Emery also argues that the state habeas court's factual finding should be disregarded because "[i]t ignores the perjury sponsored by trial counsel at trial." Emery suggests that Quinn suborned perjury by asking Emery whether anyone had coerced him into not testifying, knowing that he would say he had not been coerced. Of course, Emery's argument assumes its conclusion. If, as the state habeas court found, Quinn did not coerce Emery into testifying, Quinn did not suborn (and Emery did not commit) perjury.

16

V.

Emery makes a half-hearted argument, based on *Penry v. Lynaugh*, 492 U.S. 302 (1989), that the Texas sentencing scheme, as applied through the jury instructions, was unconstitutional because it prevented the jury from considering evidence of the abuse he suffered as a child. Instructional error of this sort does not amount to a constitutional violation "unless there is a reasonable likelihood that the jury applied the challenged instruction in a way that prevents the consideration of constitutionally relevant mitigating evidence." *Lackey v. Scott*, 28 F.3d 486, 489 (5th Cir. 1994) (quoting *Johnson v. Texas*, 509 U.S. 350, 367 (1993)) (internal quotation marks omitted). Furthermore, the mitigating evidence "must demonstrate a 'uniquely severe permanent handicap[] with which the defendant was burdened through no fault of his own.'" *Turner v. Johnson*, 106 F.3d 1178, 1189 (5th Cir. 1997) (quoting *Graham v. Collins*, 950 F.2d 1009, 1029 (5th Cir. 1992) (en banc), *aff'd*, 506 U.S. 461 (1993)).

Whatever faults may have existed in the death penalty scheme that Texas maintained prior to 1991, *see* TEX. CODE CRIM. PROC. ANN art. 37.071(b) (Vernon 1981 & Supp. 1991) (amended 1991) (current version at TEX. CODE CRIM. PROC. ANN. art. 37.071(b)-(e) (Vernon Supp. 1997)),[10] the trial court had the benefit of *Penry* and correctly

---

[10] Texas modified its death penalty procedures to comply with *Penry*'s teachings. *See* TEX. CODE CRIM. PROC. ANN. art 37.071 (Vernon Supp. 1997). Although the relevant amendment became effective September 1, 1991, and the charge on punishment was given November 26, 1991, the amendment applied only to offenses committed before the effective date of the act. *See* Act of June 16, 1991, 72d Leg., R.S., ch. 838, § 5, 1991 Tex. Sess. Law Serv. 2898, 2901 (Vernon).

17

modified its instruction to comport with the Supreme Court's decision. Specifically, the court instructed the jury:

> [Y]our answers to the Special Issues, which determine the punishment to be assessed the defendant by the court, should be reflective of your finding as to the personal moral culpability of the defendant in this case.
>
> When you deliberate about the questions posed in the Special Issues, you are to consider any mitigating circumstances supported by the evidence presented in both phases of the trial. A mitigating circumstance may be any aspect of the defendant's background, character, and record, or circumstances of the crime, which you believe makes a sentence of death inappropriate in this case. If you find that there are any mitigating circumstances, you must decide how much weight they deserve and give them effect when you answer the special issues. If you determine, in consideration of this evidence, that a life sentence, rather than a death sentence, is an appropriate response to the personal moral culpability of the defendant, you are instructed to answer the Special Issue under consideration "No".

This instruction allowed the jury to consider any appropriate mitigating circumstance, including a history of child abuse, and required the jury not to sentence Emery to death if a life sentence was appropriate in light of his moral culpability. The instruction adequately addressed the Court's concerns about Texas's death penalty scheme by giving the jury the ability to consider any appropriate mitigating circumstance.

Accordingly, the judgment is AFFIRMED, and the stay of execution is VACATED.

18