REVISED AUGUST 20, 2008

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

July 7, 2008

Charles R. Fulbruge III
Clerk

No. 07-70002

SAMUEL BUSTAMANTE

Petitioner-Appellant

v.

NATHANIEL QUARTERMAN,
Director, Texas Department of Criminal Justice,
Correctional Institutions Division

Respondent-Appellee

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:05-CV-01805

Before DAVIS, BARKSDALE, and BENAVIDES, Circuit Judges.

PER CURIAM:[*]

Petitioner Samuel Bustamante ("Bustamante"), convicted of capital murder in Texas and sentenced to death, appeals the denial of federal habeas relief. Bustamante contends that his counsel rendered ineffective assistance at trial in violation of the Sixth Amendment. On September 20, 2007, this Court

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

granted a Certificate of Appealability ("COA") with respect to this claim. See 28 U.S.C. § 2253(c).

Bustamante has not shown that the state court's decision—no reasonable probability that but for counsel's performance, the outcome of the proceeding would have been different—is objectively unreasonable. We therefore affirm the district court's denial of federal habeas relief.

I. BACKGROUND

On January 17, 1998, Bustamante, Walter Escamilla ("Walter"), Arthur Escamilla ("Arthur"), and Dedrick Depriest ("Depriest") planned a robbery. Walter suggested that the four of them drive to Rosenburg, Texas, to go "shopping." "Shopping" entailed offering a ride to an apparently illegal alien, taking him to a deserted location, beating him and stealing his money and jewelry. Arthur drove the group in his pickup truck, and they arrived in Rosenburg at 2:00 a.m, the time the bars closed. The group spotted Rafael Alvarado ("Alvarado" or "victim"), and Bustamante noted that Alvarado was "dressed real decent" and his watch appeared to be "real" and looked expensive, "like a yellow gold."

Alvarado offered to pay for a ride across town, and they "told him to get in." Arthur and Depriest sat in the truck cab and Bustamante and Walter rode in the truck bed with Alvarado. After about fifteen minutes, Bustamante asked Walter a question, and Walter said Bustamante should wait. Bustamante stood up and stabbed Alvarado ten times with a knife. Alvarado managed to break free and fall out of the truck to the ground. Walter shouted at the driver to stop, but by the time the truck stopped, they were unable to find Alvarado after searching for several minutes in the darkness. As they drove away, the other men called Bustamante crazy. Later that day, Bustamante's brother, Bill Bustamante ("Bill"), drove them back to the scene to search for the body. Their search was unsuccessful.

2

Subsequently, the police discovered Alvarado's body in a ditch. He was wearing a watch, a gold necklace, and a ring. His wallet contained one hundred dollars. The cause of death was stab wounds to the heart and liver and the attendant loss of blood.

A grand jury indicted Bustamante on the charge of capital murder. He was tried before a jury on the charge of capital murder in Fort Bend County, Texas. During the guilt phase of the trial, Bustamante's brother, Bill, was called to the stand and refused to testify. Thus, Bill's written statement was not admitted into evidence. The statement contained information about the murder as related by Bustamante to Bill. In addition to the facts of the instant offense, it provided that Bill had gone "shopping" with Bustamante one time. Additionally, the statement provided that after the murder the four men stopped at a truck stop. Walter, Arthur, and Depriest went inside and when "they came out they found [Bustamante] trying to get into a car that had the windows cracked a little bit, trying to get a person who was asleep in the car. They told [Bustamante] that was enough."

At the conclusion of the guilt phase of the trial, Bill's written statement was inadvertently submitted to the jury with the properly admitted exhibits. The statement was labeled exhibit 107 and another properly admitted exhibit was given the same number.[1] Realizing that the exhibit might have been erroneously provided to them, the jurors notified the trial judge, who questioned the jurors. This questioning revealed that three jurors had read the statement or portions of it either silently or aloud. Bustamante v. State, 106 S.W.3d 738, 742 (Tex. Crim. App. 2003). Nine jurors had not read it themselves but had heard some or all of it read aloud. Id. Five jurors said that "they learned nothing new from the statement, three said that they learned that [Bustamante]

---

[1] The record reveals that the district attorney's office had mistakenly labeled two of its exhibits with the number 107.

had 'gone shopping' before, and four said they learned about an incident at a truck stop, after the murder, in which [Bustamante] apparently started to break into another vehicle occupied by a sleeping person." Id. Additionally, "[o]ne juror said she also learned that [Bustamante] had told his brother before leaving for Rosenburg that he intended to rob someone." Id.

The judge overruled Bustamante's motion for mistrial and instructed the jurors not to consider that statement "as evidence of any kind for any purpose at any stage of this trial." The jury found Bustamante guilty as charged. After the sentencing phase, the jury answered the special issues, and the judge imposed a death sentence.

After exhausting his direct appeal and state habeas remedies, Bustamante filed the instant federal habeas petition. The district court denied relief and a COA. This Court granted Bustamante's request to issue a COA with respect to whether counsel rendered ineffective assistance during the guilt phase of the trial.

## II.    STANDARD OF REVIEW

Bustamante filed his § 2254 petition for a writ of habeas corpus after the effective date of the Antiterrorism and Effective Death Penalty Act (AEDPA). The petition, therefore, is subject to AEDPA. See Lindh v. Murphy, 521 U.S. 320, 336 (1997). Pursuant to the federal habeas statute, as amended by AEDPA, we defer to a state court's adjudication of a petitioner's claims on the merits unless the state court's decision was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court's decision is deemed contrary to clearly established federal law if it reaches a legal conclusion in direct conflict with a prior decision of the Supreme Court or if it

4

reaches a different conclusion than the Supreme Court based on materially indistinguishable facts. Williams v. Taylor, 529 U.S. 362, 404-08 (2000). A state court's decision constitutes an unreasonable application of clearly established federal law if it is "objectively unreasonable." Id. at 409.

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

To establish ineffective assistance of counsel, Bustamante must show (1) defense counsel's performance was deficient and (2) this deficient performance prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687 (1984). We must find that trial counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." Id. The Supreme Court instructs courts to look at the "norms of practice as reflected in the American Bar Association standards" and to consider "all the circumstances" of a case. Id. at 688. While "[j]udicial scrutiny of counsel's performance must be highly deferential," Bustamante can demonstrate deficient performance if he shows "that counsel's representation fell below an objective standard of reasonableness." Id. at 688. However, "[t]here is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" United States v. Webster, 392 F.3d 787, 793 (5th Cir. 2004) (quoting Strickland, 466 U.S. at 689). Strickland's "prejudice" prong requires a reasonable probability that, but for the deficient performance of his trial counsel, the outcome of his capital murder trial would have been different. Strickland, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.

Bustamante contends that counsel rendered ineffective assistance by failing to inspect the trial exhibits before they were given to the jury, thus allowing an exhibit that had not been admitted to be considered by the jury. Although Bustamante cites various cases from our sister circuits and state courts that indicate it is counsel's responsibility to ensure that only admitted

5

exhibits are provided to the jury, there is no case cited (and we are aware of none) which holds that failure to do so constitutes deficient performance under Strickland. We will assume for purposes of this appeal that such an omission by counsel satisfies the first prong of Strickland.[2]

With respect to the prejudice prong of Strickland, the crux of Bustamante's argument is that but for his brother's statement, there is a reasonable probability that at least one juror would have found that he did not intend to rob the victim. Under that scenario, Bustamante would not be guilty of capital murder.[3] In other words, Bustamante apparently concedes that based on all the incriminating evidence against him, the jury would have found that he killed the victim. Nevertheless, he insists that the evidence of his intent to rob was weak and thus his brother's statement providing that Bustamante told Bill that they "were going to Rosenberg shopping" demonstrates prejudice. Bustamante also points to the portions of the statement providing that: (1) Bustamante and Bill had gone "shopping" on one other occasion; and (2) Bustamante apparently tried to rob a person sleeping in a car after the murder. To determine whether Bustamante has shown prejudice, we start by reviewing the strength of the government's evidence that was properly admitted before the jury.

Bustamante's Confession

In Bustamante's confession to the police, he stated that on the day of the murder he had been "[b]arbecuing and drinking" with Walter, Arthur and "Dee" (Depriest). It had been Walter's idea to drive to Rosenberg to go "shopping." He explained that "shopping" meant "they pick up – – they call them wetbacks.

---

[2] "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Strickland, 466 U.S. at 697.

[3] Tex. Pen.Code § 19.03 (a)(2)("A person commits an offense if the person commits murder as defined under Section 19.02(b)(1) and ... the person intentionally commits the murder in the course of committing or attempting to commit . . . robbery....").

They pick them up, act like they're going to give them a ride or something, they catch him leaving the bars at closing." "And they catch them or they catch them walking down the street." "And they beat the heck out of them." Bustamante further confessed "[t]hey do it for money." More specifically, "they "[b]eat them and take it." "They'd been doing that for years."

On the night of the murder, they started driving to Rosenberg with the intention of arriving before the bars closed at 2:00 am. Arthur drove his pickup truck, with Depriest as a passenger in the cab and Walter and Bustamante sitting in the bed of the truck. They drove by "Mexican bars" for over two hours. Then "[w]e found this one. He asked us to give him a ride." Alvarado, the soon-to-be victim, said he would pay for the ride. "So naturally we all told him to get in." Bustamante described the victim as "dressed real decent" with two or three gold chains and a watch that looked "real," "like a yellow gold," and expensive. Alvarado rode in the bed of the pickup with Bustamante and Walter. The plan was to drive the victim to "someplace, Rabbit Road,"[4] and "everybody was going to have a piece of him, be involved." But Bustamante "didn't let him make it that far." Although the other three men told Bustamante to "wait," he nonetheless began stabbing the victim with a knife. Bustamante further explained that Walter tried to restrain the victim, who struggled while Bustamante stabbed him about ten times. During the struggle, the victim fell out of the truck bed.

After alerting the driver of the truck, they made a U-turn and went back to find the body. After searching for a while, Bustamante and the other men could not find him in the dark and drove home. Later that day, they drove back to the scene to search for the body. Bustamante wanted to "comb the area more

---

[4] Bustamante didn't know "where that is, or if there even is a Rabbit Road." According to other evidence at trial, there is a Jackrabbit Road in the Rosenberg area.

carefully and thoroughly to find him." However, they failed to discover him because they did not realize the victim would have been able to walk that far.

Other testimony

Solomon Escamilla ("Solomon") testified that he is married to Bustamante's sister Nancy. Walter and Arthur are Solomon's brothers. On the night of the murder, Solomon was drinking and "hanging out" with his wife, Bustamante, Bill, Bill's girlfriend Brandy Riha ("Riha") and Riha's mother. Later that evening, Walter, Arthur and Depriest arrived in a pickup truck. The three men informed Solomon they were going "shopping." When the three men departed, Bustamante jumped in the bed of the pickup and left with them.

Solomon testified that "shopping" meant to "roll wetbacks." When pressed for more description, Solomon explained as follows: "Get ahold of them, beat them down, do what you've got to do to take their money." Solomon saw Bustamante after the murder and Bustamante told him that "things went wrong." Bustamante told him that "they had gotten ahold of a man last night; and he got out [of] the truck, well, fell out of the truck." Solomon testified that Bustamante was upset about the man escaping. Solomon's testimony indicates that Bustamante was upset because they were unable to rob the victim once he escaped from the truck.

Bustamante's codefendant Depriest, who had been seated in the cab of the truck, testified that he had pleaded guilty to the robbery of the victim in the case at bar. Depriest testified that the reason they turned the truck around was to "go back . . . [f]or the man." When asked what they were intending to do if they found him, Depriest responded they "[p]robably would have robbed him." He further testified that Bustmante got out of the truck to look for the victim. Bustamante said that he wanted the boots that the victim was wearing. Depriest's testimony demonstrates Bustamante's intent to rob the victim.

8

Brandy Riha, erstwhile girlfriend of Bill, testified that on the night of the murder, Bustamante told her they were driving to Rosenberg to go shopping. She thought it was strange to go shopping so late at night. Riha's testimony also provides evidence of Bustamante's intent to rob the victim.

Although Bustamante concedes there is overwhelming evidence that he murdered Alvarado, he asserts that the evidence that he killed the victim during the course of a robbery was largely circumstantial. He argues that his brother's statement was prejudicial because it was direct evidence of his intent to rob.

We understand Bustamante's argument to be that his brother's statement prejudiced him because the properly admitted evidence of his intent to rob was weak. We disagree. As outlined above, Bustamante's own confession provided damning evidence of his intent to rob. In his confession, Bustamante described the plan to find an apparently illegal alien who was leaving a bar and, under the ruse of giving him a ride, take him to a remote vicinity and all four men would beat the victim. Bustamante's confession shows that he had taken notice of the victim's gold chains and apparently expensive watch. In addition to Bustamante's confession, Depriest testified that, as they were searching for the victim, Bustamante stated that he wanted the victim's boots. Riha testified that on the night of the murder Bustamante told her he was leaving to go "shopping"; however, she did not understand what Bustamante meant at the time. Further, Solomon testified that Bustamante appeared upset when he told Solomon that the victim had escaped.

Contrary to Bustamante's assertion, we conclude that, aside from his brother's statement, there is overwhelming evidence of Bustamante's intent to rob the victim. Bustamante correctly asserts that the Strickland prejudice test is not simply whether there was sufficient evidence to convict him of capital murder without his brother's statement. Nonetheless, the strength of the incriminating evidence informs the determination of prejudice. See Williams v.

Taylor, 529 U.S. 362, 398 (2000) (explaining that in making the prejudice determination under Strickland the court "correctly emphasized the strength of the prosecution evidence").

In Miller v. Dretke, the petitioner moved for a COA, alleging that counsel rendered ineffective assistance by failing to object to admission of evidence of an extra-judicial confession of a codefendant that implicated the petitioner. 404 F.3d 908, 918 (5th Cir. 2005). This Court found that, "in light of the other overwhelming evidence against" the petitioner, there was not a reasonable probability that he would be found not guilty. Id. Among other things, a witness testified that the petitioner had admitted shooting the victims. Id. at 919.

Here, the Texas Court of Criminal Appeals found no reasonable probability that but for Bustamante's brother's statement, the jury would have acquitted him of capital murder. In other words, it found no reasonable probability that, but for the brother's statement, the jury would not have found that the killing occurred during the course of a robbery. As previously set forth, we are constrained under AEDPA to determine whether the state court's conclusion is "contrary to, or involved an unreasonable application of, clearly established Federal law." § 2254(d).

Bustamante has failed to "show a 'reasonable probability' that the jury would have otherwise harbored a reasonable doubt concerning guilt." Emery v. Johnson, 139 F.3d 191, 196 (5th Cir. 1997) (citation omitted). Most of Bill's statement was duplicative of other testimony at trial. To the extent Bill's statement was duplicative, it fails to demonstrate prejudice. See id. at 197 (explaining that "testimony about the confession was duplicative of [other] testimony" and thus the petitioner "cannot demonstrate that a third source of the same confession would have sufficed to change the result of his trial").

There are, however, two pieces of information in Bill's statement that were not duplicative or cumulative of the evidence admitted at trial. Bill's statement

provided that "I have gone one time with [Bustamante] to roll wetbacks." It further provided that during the drive home after the instant murder, the four men stopped at a truck stop and Bustamante attempted "to get to a person who was asleep in the car." The other three men persuaded him to stop. This evidence is incriminating and should not have been considered by the jury. Nonetheless, it pales in comparison to the overwhelming evidence demonstrating this brutal, unprovoked stabbing death that occurred during the course of an attempted robbery. Cf. Henderson v. Cockrell, 333 F.3d 592, 603 (5th Cir. 2003) (holding that in view of the "brutal and senseless nature of the crime" and the overwhelming evidence of guilt, including petitioner's confession to a cellmate, there was not a reasonable probability that the evidence of petitioner's gang affiliation affected the guilty verdict).

Simply put, in light of the strength of the prosecution's evidence that Bustamante intended to rob the victim during the course of the murder, Bustamante has not shown there is a reasonable probability of a different verdict. Strickland, 466 U.S. at 694. Thus, we must conclude that the state court's conclusion is not objectively unreasonable.[5]

IV.   CONCLUSION

For the above reasons, the district court's judgment is AFFIRMED.

---

[5] Bustamante challenges the state court's findings and conclusions and its analysis. Here the state habeas court applied the proper test, concluding that "there is no reasonable probability that but for trial counsel's performance the proceeding would have been different." The court arrived at this conclusion "in light of the overwhelming evidence of [Bustamante's] guilt, including his confession to the crime." Because the state court's adjudication of the claim was not an unreasonable application of federal law, its decision must be afforded AEDPA deference. See Panetti v. Quarterman, __ U.S. __, 127 S.Ct. 2842, 2858 (2007). Even assuming arguendo that AEDPA deference is not warranted under § 2254(d), under de novo review we would nonetheless find that in light of the overwhelming evidence, he has not shown Strickland prejudice. See Williams v. Collins, 16 F.3d 626, 634 (5th Cir. 1994) (holding that Strickland prejudice was not shown because of the overwhelming evidence) (pre-AEDPA case).