**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 21, 2012

No. 11-30859

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff–Appellee

v.

JONATHAN SENTILL FRANCISCO,

Defendant–Appellant

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 1:10-CR-00123-01

Before WIENER, CLEMENT and PRADO, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:[*]

Defendant–Appellant Jonathan Francisco appeals his sentence and conviction for the unlawful killing of Charles Jackson, Jr. For the reasons stated below, we AFFIRM.

## I. BACKGROUND

On April 29, 2010, Francisco was indicted for second-degree murder in violation of 18 U.S.C. § 1111. The Government alleged that Francisco had unlawfully killed Jackson while both were inmates at the United States

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 11-30859

Penitentiary in Pollock, Louisiana. One month before the indictment, Francisco's mother had filed a civil suit against the prison, alleging that Francisco's placement in the Special Housing Unit was causing his mental health to deteriorate. Acknowledging this civil suit, the magistrate judge ordered a psychological examination to determine whether Francisco was competent to stand trial and whether he was sane at the time of the alleged killing. The judge referred Francisco to the U.S. Medical Center for Federal Prisoners for evaluation and stayed the criminal proceedings pending the results.

Dr. Richard Frederick conducted Francisco's evaluation and detailed his findings in a competency report. According to Dr. Frederick, multiple doctors had evaluated Francisco since the alleged crime, each in response to Francisco's erratic behavior. The first evaluation occurred in August 2008, one month after the alleged crime took place, and Dr. Melissa Hughes determined that Francisco did not suffer from a major mental illness. The next evaluation was prompted by Francisco setting fire to his mattress and requesting medication. It resulted in Dr. Hughes concluding that Francisco "was making an attempt to appear mentally ill." A few months later, Francisco began exhibiting poor hygiene practices. Dr. Sandra Lang reported that this was "not the result of any major mental illness concerns" but instead was more likely "a protest as an effort to be transferred back to open population." Dr. Lang observed Francisco again after he began to not respond to some staff members and failed to follow staff orders. She determined that Francisco's nonresponsive behavior was "of his own volition" and that he was "not suffering from any major mental illness." She also found him "insightful enough to know that if his behavior is seen as disorganized," it would "probably have an impact on his pending case." Finally, Francisco had been referred to telepsychiatry in April 2010 because of his continued poor hygiene and mutism. Dr. James Wolfson examined Francisco

2

through video conference and determined that, notwithstanding the limitations of the video format, "malingering appear[ed] the most likely scenario."

Dr. Frederick then detailed his own observations of Francisco's behavior. On Francisco's first day at the Medical Center, he smeared feces on himself and his property. He continued to maintain poor hygiene and was nonverbal with the staff. Francisco also exhibited erratic behavior in the many hours of video from his cell. For example, Dr. Frederick noted that Francisco squatted in the corner instead of sleeping in his bed, and once, after being transferred to a different unit, was observed stirring his feces in the toilet, refusing to flush it.

After "closely review[ing] his behavior," Dr. Frederick concluded that Francisco was not mentally ill and was instead "malingering mental illness." Dr. Frederick noted that much of Francisco's behavior was consistent with symptoms associated with certain forms of schizophrenia, such as standing without moving, touching feces, and failing to speak or effectively communicate. But Francisco's presentation was different. For example, although he squatted on the floor in early morning hours, Francisco also stretched and rubbed his muscles, which was "qualitatively different than individuals with schizophrenia [who] are rigid and unmoving." Similarly, some individuals with schizophrenia fail to speak and engage in effective communication, but they have no choice because they are unable to speak. Francisco, by contrast, could "selectively verbally interact with others." Dr. Frederick ultimately concluded that Francisco's erratic behavior was by choice:

> Given the unbelievability of his presentation, his convenient onset of symptoms, his lack of prior significant mental health contact, his episodes of sustained rational conversation with psychologists at Pollock, his demonstration of relevant speech in court, and his obvious potential benefit for a finding [of] severe mental illness, it is our conclusion that his presentation represents protracted and persistent malingered mental illness.

After the evaluation was completed, the magistrate judge held a competency hearing under 18 U.S.C. § 4247(d). The judge indicated that, based on the report, he found Francisco competent "by clear and convincing evidence," but was willing to hear evidence from Francisco before he made that determination final. Francisco indicated that he desired to testify, but the judge was concerned about Francisco possibly waiving his Fifth Amendment privileges before his competency was determined. As a result, he denied Francisco's request, noting that "as a practical matter [he did not] see how testimony by a person who is claiming incompetence could assist the Court in making that determination anyway." Francisco's mother then testified in his defense. She testified that Francisco had gotten worse since being placed in "the hole." One visit in particular "devastated" her when she saw that "his hair was all matted and he looked like he was overmedicated, weaving and bobbing." She believed that he was clearly mentally ill. After hearing her testimony, the judge restated his finding by clear and convincing evidence that Francisco had "the ability to understand the proceedings against him and to assist his attorney in his defense."

At trial, the Government introduced a video recording of the attack and also called various prison officials, who presented their version of the events. Lieutenant Wellington Moore testified that he noticed two inmates step out of the food line in a fighting stance. He notified other officers of a fight, and Lieutenant Michael Melton and Officer Rocky Deselle ran to the location. Officer Deselle arrived to see Jackson fall to the ground and Francisco turn and mingle back in the crowd of inmates. Officer Deselle apprehended Francisco and escorted him away from the scene. Lieutenant Melton saw Jackson bleeding from the neck and applied pressure to the wound. He took Jackson to the medical facility, where, less than an hour later, Jackson died.

No. 11-30859

During the investigation, prison officials recovered a "shank" from the scene. Lieutenant Melton searched Francisco's cell and observed that someone had taken the locker apart and sharpened an object against the wall, leaving a number of marks. Lieutenant Melton recognized this as a common method of creating a shank. He offered that this was likely the method used to create the shank recovered from the incident. Dr. Susan Garcia performed Jackson's autopsy and determined that the cause of death was a single stab wound to the right side of his neck. She indicated that "the weapon was most likely a single-edged sharp instrument due to the characteristics of the wound."

The defense witnesses discussed the nature of gangs in Pollock prison. Officer Patrick Laborde explained that the prison in Pollock had a number of inmates belonging to two prominent gangs, the Crips and the Bloods. FBI Special Agent Jeffrey Goins testified that Francisco was designated "as a Crip associate" and that Jackson "was one of the leaders of the Crips at Pollock." Rufus Thompson, an inmate and friend of Francisco's, testified that Francisco wanted to drop out of the Crips. He explained that some time before the incident Francisco had challenged Jackson to a fist fight in an attempt to leave the gang, but Jackson declined, indicating that he wished to use weapons. After that, Thompson felt that Francisco became paranoid about something happening to him. Francisco himself also testified, but his testimony was mostly incoherent.

At the close of evidence, Francisco's counsel requested that an instruction on justification be included in the charge based on evidence "that this could be a self-defense situation." The court rejected this request because it did not believe justification was "even remotely raised by the evidence" because there was "absolutely no evidence" that Francisco was under an imminent threat. Francisco's counsel also moved for a mistrial "based on the defendant's lack of cooperation and lack of assistance to counsel." Counsel offered some of the notes that Francisco had written during the trial as evidence that, because of his

5

mental state, Francisco had not been able to provide the assistance needed to defend him. The court responded by referencing the competency report completed by Dr. Frederick. The court found Dr. Frederick's conclusion was clearly stated and observed nothing "that was different from anything described in that report." Thus, the court could "only conclude that [Francisco] continued to malinger all the way through," and "conduct of choice [was] not a basis for declaring a mistrial."

The case was submitted to the jury, which found Francisco guilty. The court sentenced him to 360 months imprisonment, to be followed by three years of supervised release. Francisco timely appealed, arguing that the magistrate judge erred in (1) denying him an opportunity to testify at the competency hearing, and (2) finding him competent to stand trial. Francisco also argues that the district court erred in (1) denying his second motion for a continuance, (2) denying his challenge for cause of a potential juror, (3) admitting an unduly gruesome photo of Jackson's stab wound, (4) failing to include a justification instruction in the charge, and (5) failing to declare a mistrial based on lack of competency.

## II. DISCUSSION

### A.    Competency Determination

Francisco's counsel moved for a competency hearing under 18 U.S.C. § 4241. Section 4241 provides that a court shall grant a defendant's motion for a competency hearing "if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(a). This hearing "shall be conducted pursuant to the provisions of section 4247(d)." *Id.* § 4241(c). Section 4247(d) instructs that the person subject to the hearing "shall be represented by counsel" and "*shall be*

*afforded an opportunity to testify*, to present evidence, to subpoena witnesses on his behalf, and to confront and cross-examine witnesses who appear at the hearing." *Id.* § 4247(d) (emphasis added). If, after the hearing, the court finds "by a preponderance of the evidence" that the defendant is mentally incompetent for trial, "the court shall commit the defendant to the custody of the Attorney General." *Id.* § 4241(d).

Francisco raises three issues involving his competency determination: (1) that the magistrate judge erred in denying him an opportunity to testify at the competency hearing, (2) that the magistrate judge erred in finding him competent for trial, and (3) that the district court erred in failing to declare a mistrial based on his lack of competence. We first address the latter two issues together as both involve an evaluation of the evidence.

We will not reverse a district court's competency determination "unless it is clearly arbitrary or unwarranted—a species of clear error review—but this mixed question of fact and law requires us to re-analyze the facts and take a hard look at the trial judge's ultimate conclusion." *United States v. Joseph*, 333 F.3d 587, 589 (5th Cir. 2003) (internal quotation marks omitted). Francisco lists numerous examples of his erratic behavior as evidence of his mental incompetence, as well as his mother's testimony regarding similar acts. But none of this evidence addresses the malingering that was central to both the magistrate judge's and the district court's decisions. Dr. Frederick's report indicated that as many as four doctors observed Francisco's behavior over a two-year period, and each doctor concluded that Francisco was not mentally ill. Based on his observations and those of the other doctors, Dr. Frederick concluded that Francisco was malingering mental illness. Both the magistrate judge and the district court relied on this report and their own observations to determine that Francisco understood the nature of the proceedings against him and could assist his counsel in the defense of the charges against him. In light

of the evidence, we cannot say that these determinations were clearly arbitrary or unwarranted.

Francisco's other competency argument concerns his ability to testify at his competency hearing.  Francisco argues that the magistrate judge's decision to not allow him to testify was "in violation of the Fifth, Sixth, and Fourteenth Amendments."  *See, e.g.*, *Emery v. Johnson*, 139 F.3d 191, 198 (5th Cir. 1997) ("A criminal defendant has a constitutional right to testify on his own behalf.").  At the competency hearing, neither the magistrate judge nor Francisco referenced the statutory right provided in § 4247(d), and Francisco does not raise that provision on appeal.  Instead, he appears to assume that a defendant's constitutional right to testify extends to a pretrial competency hearing, a question this court has not previously addressed.  We need not address the scope of the constitutional right to testify, however, because Francisco never raised his objection, whatever its source, to the magistrate judge, nor did Francisco indicate what his testimony would have entailed.[1]  Thus, we review the magistrate judge's decision for plain error.  *See, e.g.*, *United States v. Flores–Martinez*, 677 F.3d 699, 709–10 (5th Cir. 2012) (noting that the defendant did not inform the district court about certain subjects he wished to testify to and reviewing "for plain error" the denial of the defendant's right to testify as to those subjects); *United States v. Gourley*, 168 F.3d 165, 171 n.10 (5th Cir. 1999) (reviewing for plain error the defendant's constitutional objection to an obstruction-of-justice sentence enhancement, which the defendant argued impeded his right to testify, because the defendant failed to object to the sentence enhancement in the district court).

---

[1]  Francisco also did not raise the issue to the district court.  But, as explained above, the district court did make a determination as to Francisco's competency when reviewing his motion for a mistrial.

No. 11-30859

Under the plain error standard, Francisco must show that "(1) it was error to deny him his right to testify, (2) the error was clear or obvious, rather than subject to reasonable dispute, and (3) the error affected his substantial rights, which in the ordinary case means . . . that it affected the outcome." *Flores–Martinez*, 677 F.3d at 710 (alteration in original) (citing *Puckett v. United States*, 556 U.S. 129, 135 (2009)) (internal quotation marks omitted). If this showing is made, "we will consider exercising our discretion to remedy the error only if the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Id.* (alteration in original) (internal quotation marks omitted). Even assuming that Francisco can meet the first two prongs, he fails to satisfy the third. First, Francisco offers no argument regarding how his testimony would have altered the outcome of the competency hearing. He simply argues that he should have been allowed to testify without explaining what that testimony would entail. Second, there is no indication that the magistrate judge would have reached a different result even if Francisco had disclosed his potential testimony. Instead, the magistrate judge stated that he did not "see how testimony by a person who is claiming incompetence could assist the Court in making that determination anyway." Finally, the strength of the evidence regarding Francisco's malingering supports the conclusion that any assumed error did not affect the outcome of the hearing.[2] All of the doctors who evaluated Francisco determined that he was not mentally ill, and Dr. Frederick concluded that Francisco was malingering mental illness—a conclusion that would undercut the very testimony that Francisco sought to provide. Thus, because we conclude that any error committed did not affect Francisco's substantial rights,

---

[2] It is also worth noting that the magistrate judge found "by clear and convincing evidence" that Francisco was competent for trial, which is a more difficult burden than the "preponderance of the evidence" standard articulated in 18 U.S.C. § 4241(d).

9

we decline to reverse the magistrate judge's decision denying him the opportunity to testify at his competency hearing.

**B.    Motion for Continuance**

Francisco also challenges the district court's denial of his second motion for continuance. Shortly before trial, the Government notified Francisco's counsel that it had discovered, in a report, a witness who might be beneficial to the defense. The report revealed that, before the homicide, Francisco had told another inmate, Tamarki Sharkey, that Jackson had been harassing him. Based on this newly discovered evidence, Francisco's counsel requested a continuance to attempt to locate Sharkey for trial. The district court granted the request, and the trial was rescheduled.

On the morning of the rescheduled trial, Francisco's counsel requested another continuance to attempt to find Sharkey. At least three different attempts had been made to serve a subpoena on Sharkey, but Sharkey did not reside at any of the addresses furnished. Francisco's counsel asked for more time because he had no other address to try and no other information as to where Sharkey might be located. Recognizing that "this [was] one of those situations where you may never find this individual," the court denied the request, noting that "trial can't be continued forever on that basis alone."

We review a district court's denial of a continuance for abuse of discretion. *United States v. Walters*, 351 F.3d 159, 170 (5th Cir. 2003). "To prevail, the movant must show that the denial resulted in specific and compelling or serious prejudice." *United States v. Barnett*, 197 F.3d 138, 144 (5th Cir. 1999) (internal quotation marks omitted). Francisco has not made such a showing. Francisco argues that the court's ruling denied him the opportunity to produce Sharkey as a witness with testimony regarding Francisco's state of mind. But Francisco did not indicate that he would have been able to find Sharkey had the court granted the continuance. Instead, Francisco indicated the opposite by stating that he

had no other address to try and no other information regarding Sharkey's location. The district court delayed the case for two months to allow Francisco to attempt to find Sharkey. The court did not abuse its discretion in declining to delay the trial further.

## C.    Challenge for Cause

Francisco next challenges the district court's denial of his challenge for cause of potential juror Carey. During voir dire, the Government listed Anthony Garrow as a potential witness. Potential juror Carey indicated that she knew Garrow, who was her sister-in-law's nephew-in-law, and regarded him as a friend. Based on this relationship, Francisco challenged Carey for cause, and the court denied the challenge. Francisco now argues that the court should have granted his challenge and "not required the defense to use a peremptory challenge to exclude Ms. Carey from the jury."

We review a district court's ruling on jury impartiality for "manifest abuse of discretion." *United States v. Wharton*, 320 F.3d 526, 535 (5th Cir. 2003) (internal quotation marks omitted). Even if Francisco's challenge had merit, "[a] district court's erroneous refusal to grant a defendant's challenge for cause is only grounds for reversal if the defendant establishes that the jury which actually sat to decide his guilt or innocence was not impartial." *Id.* Francisco makes no allegation and presents no proof that the jury that heard his case was not impartial. As a result, he has failed to show that the district court abused its discretion.

## D.    Photograph of Injury

During the Government's examination of Nurse Peggy Allmendinger, the court admitted into evidence, over Francisco's objection, a photograph of Jackson's wound. The photograph shows a one-inch gash on the right side of Jackson's neck. Also visible are bloody towels, which were apparently used to clean the wound for the photograph. Francisco argues that the photograph was

admitted "for no other reason than to inflame the jury." He notes that the victim could have been "cleaned up more" before the photograph and that the bloody towels should have certainly been omitted. He also argues that there was no need to admit the unduly gruesome photograph because the coroner testified at length as to the wound, Nurse Allmendinger's injury assessment described and depicted the wound, and the autopsy report also detailed the same information.

We review a district court's evidentiary rulings for abuse of discretion. *United States v. McCann*, 613 F.3d 486, 498 (5th Cir. 2010). "[O]ur caselaw indicates that admitting gruesome photographs of the victim's body in a murder case ordinarily does not rise to an abuse of discretion where those photos have nontrivial probative value." *United States v. Fields*, 483 F.3d 313, 355 (5th Cir. 2007). But even if we find that the district court abused its discretion, the harmless error doctrine applies, under which an error is reversible only if it affected a party's substantial rights. *McCann*, 613 F.3d at 498. Francisco is correct that the bloody towels were unnecessary for the photo and could easily have been removed. Overall, however, the photo had nontrivial probative value. The size of the wound was relevant to both the cause of death and size of the weapon involved. Additionally, Francisco makes no argument as to how he was prejudiced by the admission of the photo, noting only that it should have been excluded. Based on the probative value and marginal prejudice involved, the district court did not abuse its discretion by admitting the photo.

## E.    Justification Instruction

Finally, Francisco challenges the district court's refusal to submit a jury instruction on justification. A defendant is generally entitled to an instruction as to any recognized defense "for which there exists evidence sufficient for a reasonable jury to find in his favor." *United States v. Branch*, 91 F.3d 699, 711–12 (5th Cir. 1996) (internal quotation marks omitted). A court may, however, "refuse to give a requested [instruction] that lacks sufficient foundation

in the evidence." *Id.* at 712. We review a district court's failure to provide a requested jury instruction for abuse of discretion, "affording the trial court substantial latitude in describing the law to the jurors." *United States v. Grant*, 683 F.3d 639, 650 (5th Cir. 2012) (internal quotation marks omitted).

To be entitled to a justification defense, a defendant must present proof of four elements:

> (1) that the defendant was under an unlawful and present, imminent, and impending [threat] of such a nature as to induce a well-grounded apprehension of death or serious bodily injury; (2) that defendant had not recklessly or negligently placed himself in a situation in which it was probable that he would be [forced to choose the criminal conduct]; (3) that defendant had no reasonable legal alternative to violating the law; a chance both to refuse to do the criminal act and also to avoid the threatened harm; and (4) that a direct causal relationship may be reasonably anticipated between the [criminal] action taken and the avoidance of the [threatened] harm.

*United States v. Posada-Rios*, 158 F.3d 832, 873 (5th Cir. 1998) (alterations in original) (internal quotation marks omitted). Francisco argues that inmate Thompson's testimony supported the justification instruction because it showed that Francisco had a well-grounded fear of death or serious bodily injury; Francisco's desire to leave the Crips made him a target, causing him to be paranoid about his safety. While this testimony establishes that Francisco likely feared for his safety, it does not support a finding that he was under a "present, imminent, and impending" threat. Such a threat is present only "if there is a real emergency leaving no time to pursue any legal alternative." *Id.* at 874. This requires proof "of absolute and uncontrollable necessity." *Id.* (quoting *The Diana*, 74 U.S. (7 Wall.) 354, 360–61 (1868)). Francisco presented no evidence to support a finding that such a threat was present. As a result, the district court did not abuse its discretion by denying the instruction.

No. 11-30859

## III. CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.